IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GLORIA MARCOTTE, As the Personal
Representative of the ESTATE OF JOSEPH ORTEGA,

       Plaintiff,

vs.                                      No. CIV-04-0836 JB/RLP

BURLINGTON NORTHERN SANTA FE RAIL
CORPORATION, a Texas corporation, NATIONAL
RAILROAD PASSENGER CORPORATION d/b/a
AMTRAK,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Relief from Judgment Pursuant to Rule 60(b) for Fraud, filed December 22, 2006 (Doc. 101). The Court held a hearing on this matter on May 1, 2007.  See Clerk's Minutes, filed May 1, 2007 (Doc. 117).  The primary issue is whether the Court should reopen its judgment entered January 6, 2006, which, on the parties' joint motion, dismissed this matter with prejudice, because of fraud, mistake, and/or misconduct. See Order, filed Jan. 1, 2006 (Doc. 100).  Because Marcotte has not shown by clear-and-convincing evidence that the misconduct by Defendant Burlington Northern Santa Fe Rail Corporation ("BNSF") materially impacted her ability to make a calculated and deliberate choice to settle this case, the Court concludes that the Court's final judgment of January 6, 2006 will not be reopened.

## PROCEDURAL BACKGROUND

This action arose from a train-vehicle collision that occurred at the Alameda railroad crossing in Bernalillo County, New Mexico on July 8, 2001.  See Notice of Removal from Second

Judicial District Court, filed July 22, 2004 (Doc. 1), Exhibit A, Complaint ¶ 8, at 2 ("Complaint"). "[A]t approximately 6:44 p.m., Joseph Ortega was a passenger in a 1989 4-door Chrysler New Yorker belonging to and driven by Fabian Ortega [. . .]. Also present was Sharon Ortega." Complaint ¶ 8, at 2. Gloria Marcotte filed her action in state court as the Personal Representative of the Estate of Joseph Ortega. See Complaint at 1. The Defendants removed the suit to the federal court on the basis of federal question and diversity jurisdiction. See Notice of Removal from Second Judicial District Court ¶¶ 5, 7, at 2, filed July 22, 2004 (Doc. 1).

**1.      The Parties' Basic Theories.**

One of Marcotte's basic theories was that the crossing-warning system at the accident site had not functioned properly and that, as a result, the vehicle in which Marcotte's decedent was traveling did not receive adequate warning that a train was approaching. See Complaint ¶¶ 11, 13(a), 13(e), 13(f), 16, at 3- 4, 7-8. Marcotte alleges that BNSF was negligent in the maintenance of its track, crossing, and property by failing to "maintain its track, railroad crossing and right of way in a safe and reasonable condition in violation of New Mexico and federal law. Non-compliant track conditions were ignored and misreported." Complaint ¶¶ 12, 13(a)-(c), at 3. Marcotte additionally alleged that BNSF "knew or should have known that the gates, warning lights, and/or warning signals were defective and failed to provide motorists warning of the approach of a train at [the Alameda] crossing." Complaint ¶ 13(e), at 4. Marcotte also accused BNSF of entrusting "the maintenance of the railroad crossing to individuals when it knew, or should have known, said individuals were not properly instructed on issues of safety for the motoring public." Complaint ¶ 13(i), at 4. Lastly, Marcotte alleged that the "[r]equired inspections of track and crossings were not performed, misreported and repeatedly failed to identify obvious non-complaint conditions." Complaint ¶ 13(j), at 5.

-2-

Throughout this litigation, BNSF has denied that the crossing suffered from any defect.  <u>See</u> Answer of the Burlington Northern and Santa Fe Railway Company to Plaintiff's Complaint for Negligence, Wrongful Death, and Punitive Damages at ¶¶ 11, 13, 16, at 2-3, filed July 22, 2004 (Doc. 5)("Answer").   BNSF asserted nine defenses in its Answer to Marcotte's Complaint.  <u>See</u> Answer of the BNSF to Plaintiff's Complaint for Negligence, Wrongful Death and Punitive Damages ("Answer") at 6-7, filed July 22, 2004 (Doc. 5).   These defenses included: that Marcotte failed to state claim upon which relief could be granted; that the federal preemption and/or compliance with application federal statutes and regulations barred Marcotte's claims; that  any damages suffered by Marcotte were the result of an independent intervening cause or caused by the negligence of a third party; that Marcotte's injuries and damages were not foreseeable; that the Marcotte's decedent was negligent and therefore any recovery should be reduced by comparative negligence; that Marcotte's decedent was negligent per se; and that the Eighth and Fourteenth Amendment of the United States Constitution and Article II, Section 13 of the New Mexico Constitution barred Marcotte's claims for punitive damages.  <u>See</u> Answer at 6-7.  BNSF argued that Marcotte's decedent was negligent per se in driving through the crossing while the lights were flashing and the crossing arm of the gate was descending.  <u>See</u> Defendants' Motion for Partial Summary Judgment that Joseph Ortega's Driver was Negligent <u>Per Se</u> ¶ 1, at 1-2. ("Defendants' Summary Judgment Motion"), filed Sept. 16, 2005 (Doc. 57).   BNSF also argued Marcotte's decedent was negligent per se for being under the influence of cocaine and alcohol, and driving on a suspended license at the time of the incident.  <u>See</u> Defendants' Summary Judgment Motion ¶¶ 2-3, at 2.

### 2.    <u>Initial Discovery</u>.

The Court held its initial scheduling conference on April 7, 2005.  At that scheduling

conference, the Court set the deadline for discovery as October 4, 2005. <u>See</u> Order Adopting Attorneys' Provisional Discovery Plans, filed Apr. 4, 2005 (Doc. 30); Amended Attorneys' Provisional Discovery Plan at 3, filed Apr. 6, 2005 (Doc. 27). The Court also ordered Marcotte to identify her experts, produce her experts' reports, and have her experts ready to be deposed by August 31, 2005. <u>See</u> Initial Pretrial Report at 6, filed April 8, 2005 (Doc. 32).

Marcotte served her First Set of Interrogatories and Requests for Production on April 7, 2005. <u>See</u> Certificate of Service, filed April 7, 2005 (Doc. 28). On April 29, 2005, Marcotte served her First Amended Interrogatories and Requests for Production on the Defendants. <u>See</u> Certificate of Service, filed April 29, 2005 (Doc. 39). On June 1, 2005, the Defendants certified that they had submitted their answers, responses, and objections to the Marcotte's First Amended Interrogatories and First Requests for Production. <u>See</u> Certificate of Service, filed June 1, 2005 (Doc. 41).

Interrogatory Number Two asked BNSF to "provide a complete description of the construction history of the warning lights, audible warning devices, gates, crossbucks, right-of-way, road surface and crossing surface at the rail/highway crossing at issue from 1990 to present." Letter from James P. Lyle to the Court at 3 (dated May 1, 2007), filed May 7, 2007 (Doc. 118).[1] To that interrogatory, BNSF answered on May 9, 2005: "See Public Works File, bates numbered and identified as . . . BNSF-0015-BNSF00212, undated, file, Public Project Engineering file for the Alameda Road Crossing, MP 894.83, DOT 013796.L." Mr. Lyle's May 1, 2007 Letter at 3.

Marcotte asked BNSF in Interrogatory Number Three to provide full and complete details of all inspections of the crossing that were conducted in the ten years preceding the accident. <u>See</u>

---

[1]Marcotte attached portions of BNSF's answers and objections to her First Amended Interrogatories to her Motion to Compel, filed July 12, 2005 (Doc. 45), and Mr. Lyle's May 1, 2007 letter.

Plaintiff's Motion to Compel at 6 (asking BNSF to provide "full and complete details regarding all inspections of the subject crossing which were conducted in the ten (10) years preceding the accident."). In Interrogatory Number Four, Marcotte asked for full and complete details of any reports or complaints received by BNSF regarding the railroad crossing at issue. See Plaintiff's Motion to Compel at 7. In Interrogatory Number Eight, Marcotte requested BNSF to describe any investigation that was conducted by it or on its behalf concerning the accident.  See Plaintiff's Motion to Compel at 10. In addition, Marcotte demanded that BNSF produce any documents or facts concerning maintenance and inspection of the crossing in the ten years preceding the accident. See Plaintiff's Motion to Compel  at 14-15 (appended pages from Defendant BNSF Railway's Responses and Objections to Plaintiff's First Amended Request for Production of Documents and Things, Requests for Production Numbered 2 and 5).  Lastly, Interrogatory Number Ten asked BNSF to provide "full and complete details regarding any inspection, maintenance, service or repair of the warning lights, audible warning devices, gates, crossbucks, right-of-way, road surface and crossing surface at the rail/highway crossing at issue **from 1990 to present**."  Mr. Lyle's May 1, 2007 Letter at 5 (emphasis added). On May 9, 2005, BNSF responded that it

> objects to responding to any discovery request to the extent it inquires for a period prior to July 8, 2000, and such discovery request is overly broad, burdensome, oppressive, vague, and is neither relevant nor likely to lead to the discovery of admissible evidence and is beyond the scope of Federal Rule of Civil Procedure 26. BNSF further objects on the ground that the discovery request imposes burden or expense that outweighs the likely benefits obtained, taking into account the needs of the case, the amount in controversy, the parties [sic] resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.  Without waiving those objections, see Answer and Objections to Interrogatory No. 3.

Mr. Lyle's May 1, 2007 Letter at 5.

### 3.    Larry J. Farnham's Expert Report Regarding the Crossing.

On July 8, 2005, Marcotte's expert, Larry J. Farnham, inspected the Alameda crossing for the purpose of determining whether he could identify any ascertainable defects in the functioning or operation of the crossing.  See Plaintiff's Motion for Relief from Judgment Pursuant to Rule 60(b) for Fraud ¶ 4, at 2, filed December 22, 2006 (Doc. 100) ("Marcotte's 60(b) Motion").  Although Farnham inspected the crossing and took pictures[2] of the crossing signal case interior, Harmon Phase Motion Detection #1 (PMD-1), track, grade crossing itself and overall pictures of the active warning devices, there is no indication of what exactly Farnham did during his inspection of the crossing. See Farnham Report at 4.  Specifically, Farnham does not indicate -- in his report or at his deposition -- that BNSF activated the warning lights or crossing arms for him during his inspection.  The PMD-1"controls the grade crossing active warning system.  The PMD-1 is a train detection unit that detects the motion of a train as it proceeds towards the crossing, starting the flashing lights and subsequently lowering the gates."  Farnham Report at 4.  "If the train stops or the train is moving away from the crossing the PMD-1 will turn off the Active Warning system allowing road traffic to proceed."  Id.

In the course of this inspection, although the expert did not identify any defects in the functioning of the warning lights, which flash when a train is approaching the crossing, see id., he described the warning lights at the crossing as follows:

The crossing warning system consists of an active warning system of flashing lights

---

[2]The quality of the pictures attached to the copy of Farnham's Report in the record is very poor. They are black-and-white photocopies of the photographs.  See Farnham Report at 13-15. Because the copies of the photographs are of such poor quality, the Court is unable to discern from them whether Farnham took photographs of the warning system while it was activated.  Farnham refers to lights and gates at the crossing as "the Active Warning system" without explaining whether the warning system was activated.  Farnham Report at 4.

and gates.  There is a set of mast-mounted flashers on the signal mast for each direction of travel.  There are also Cantilever mounted flashers for the center lanes of travel.  These consist of both forward facing flashers and back facing flashers for traffic in the opposite direction.  In total there are six sets of flashing lights.

Plaintiff's Expert Disclosures and Reports, filed Aug. 23, 2005 (Doc. 53), Confidential Report of Wilfred Lawrence Farnham, Jr. (Larry) at 4 ("Farnham Report").  Initially, in his report Farnham makes the following conclusions: (i) the "site distances at the crossing are not satisfactory and proper operation of the active warning devices is essential for a safe crossing"; (ii) the witness statements prove that the gate malfunctioned at the time of the incident; (iii) the "crossing gate would have been broken off at the sheer pins if hit by the accident vehicle with gate arms in the full down position"; (iv) a "gouge mark on the road confirms that the accident vehicle was in the correct lane of travel when passing the gate arm"; (v) the incident likely would not have occurred if the active warning system at the crossing had provided twenty seconds of warning time; (vi) the incident likely would not have occurred if the warning system at the crossing had provided five seconds of gate down time before train arrival; (vii) the active warning system as installed in the crossing is subject to "potential activation failures."  Memorandum in Support of BNSF Railway and Amtrack's First Motion in Limine, to Exclude Opinions of Larry J. Farnham, and Disqualify Him as Plaintiff's Expert at 9, filed September 15, 2005 (Doc. 56) ("Defendants' Daubert Memo."), Exhibit C, Confidential Report of Larry J. Farnham ("Farnham Report") at 8.

Much of Farnham's report is a general discussion of equipment, what the design can do , and what equipment BNSF did not have.  Farnham noted that the PMD-1 can cause activation failures in the warning system at the crossing.  See Farnham Report at 6.  He also noted "crossing maintenance by the railroad maintenance personnel is a critical factor in maintaining a safe crossing."  Farnham Report at 6.  Farnham noted that an Island Recovery Module ("IRM") module

can solve the activation problems with the PMD-1, but that BNSF has not installed an IRM at the crossing where the incident occurred.  See  Farnham Report at 7.

      **4.**     **The Sweet Audit.**

      Unbeknownst to Marcotte and her expert, BNSF had sent a crew of four employees to the crossing days before the inspection by Marcotte's expert.  See Marcotte's 60(b) Motion ¶ 5, at 2. In later explaining the purpose of this visit, Sweet stated that, because there was "[a] pending lawsuit . . . we had a meeting scheduled with the plaintiff's attorney with their expert witness and we just wanted to audit the crossing before them getting out there to make sure there wasn't anything we needed to take care of before their expert witness seen it."  Marcotte's 60(b) Motion, Exhibit No. 1, Statement of Russell Sweet at 17:137 ("Sweet Statement").  Marcotte's counsel believes that this statement came in a Federal Employers Liability Act ("FELA") action to address injuries that one of the four BNSF employees who was attempting to repair the defects at the crossing suffered at the time of the July 2001 visit.  See Marcotte's 60(b) Motion at 3 n.2.

      In the course of the July 2005 inspection, BNSF employees discovered that one of the lights could not be adjusted "to where you could get a good light.  It had a shadow in it all the time, which generally indicates the mirror is in wrong or there is something wrong with the mirrors."  Sweet Statement at 15:113.  Sweet and the other BNSF employees then "went back to the shop to get a new mirror to replace the light."  Sweet Statement at 15:113.

      Sweet described the work done: "You just walked down the road, at that you kind of go, depending on footage or speed of traffic, you go so many feet out to try and focus the light where you get the best, the bright light at a certain distance from the crossing."  Sweet Statement at 15:115. In addition, the BNSF employees were apparently instructed to audit the entire crossing and adjust anything that was not in working order:

Question: Okay, that's what I'm trying to establish. So there was [sic] four of your present for the job briefing. And the job briefing also included what the task was going to be of changing the light.

Answer: Well at that time the changing of the light was not thought of yet.

Question: Okay, when Russell Sweet and Dan Owsley were there with you what, what was the task then?

Answer: We were going to look over the crossing.

Question: Okay

Answer: Check and make sure that the lights aligned, the bell was ringing, the voltage, the batteries.

Question: Everything?

Answer: Just everything.

Plaintiff's Reply in Support of Her Motion for Relief From Judgment Pursuant to Rule 60(b) for Fraud at 2 (quoting Sweet Statement at 8).[3]  Neither Marcotte's counsel nor her expert was informed or advised that BNSF employees had altered the lights at the scene before the inspection by Marcotte's expert. See Marcotte's 60(b) Motion ¶ 7, at 3.

**5.    Marcotte's Motion to Compel.**

On July 12, 2005, Marcotte filed a Motion to Compel Full Discovery Responses from BNSF. See Plaintiff's Motion to Compel Full Discovery Responses from the Defendant BNSF, filed July 12, 2005 (Doc. 45) ("Plaintiff's Motion to Compel"). In that motion, Marcotte alleged that BNSF had failed to fully answer Interrogatories numbered three, four, six, seven, eight, and fourteen, and failed to respond to request for production numbered two and five. See Plaintiff's Motion to Compel at 4, 6-16.

---

[3]Marcotte failed to attach page 8 of the Sweet statement as an exhibit, but quoted from that page in the body of her Reply.

In BNSF's Response to the Plaintiff's Motion to Compel Full Discovery Responses from BNSF, it stated:

> The [Plaintiff's Motion to Compel Full Discovery Responses from BNSF] is based on a characterization that the crossing protection at this crossing 'has a history of malfunction,' referring to a single malfunction that occurred in 1995, six years prior to the collision in this case.  That characterization, is, as Plaintiff's counsel is aware, incorrect because at the request of law enforcement officers at the scene of the collision, the protective devices were tested immediately following the collision and were found to be operating correctly.  Indeed, BNSF produced the maintenance and testing records for these protective devices for the one-year period preceding the collision and aside from the routine replacement of lights and bulbs and other parts, the protective devices performed flawlessly.

Response to the Plaintiff's Motion to Compel Full Discovery Responses from BNSF at 2, filed July 28, 2005 (Doc. 48)("BNSF Response to Plaintiff's Motion to Compel").  BNSF argued that the Plaintiff's Motion to Compel was untimely, that there was an agreement between Marcotte's counsel and BNSF that Marcotte's counsel would not compel further responses from BNSF if BNSF provided circuitry plans, which BNSF did provide, and that the Plaintiff's Motion to compel sought "to compel the production of thousands of documents over a decade-long period that have virtually nothing to do with the case and which would be incredibly burdensome to locate, review, and copy." BNSF Response to Plaintiff's Motion to Compel at 2.  BNSF also limited its answers to Interrogatory Number Four to "trouble tickets" for one year preceding the date of the incident.  See Plaintiff's Motion to Compel at 7, BNSF Answer to Interrogatory Number 4, (explaining that trouble tickets "document specific incidents in which a member of the public (either private or police entity) has contacted BNSF and reported a problem with this crossing.").

The Court held a hearing on the Plaintiff's Motion to Compel and BNSF's Response on August 10, 2005. See Clerk's Minutes, filed Aug. 10, 2005 (Doc. 52).  At the hearing on the motion to compel, the Court ordered BNSF to amend its answers to interrogatories numbered three, four,

six, seven, and fourteen. <u>See</u> Transcript of Hearing at 11:1-5 (Court), 13:7-14 (Court), 14:19-15:6

(Court), 16:5-22 (Court)(taken August 10, 2005)("Discovery Motion Tr.")[4]; Order, filed November

9, 2005 (Doc. 89). Mr. James P. Lyle, on behalf of Marcotte, and Ms. Brenda Saiz, on BNSF's

behalf, both agreed discovery was still ongoing until September or October. <u>See</u> Discovery Motion

Tr. at 4:3-6 (Court, Saiz & Lyle). BNSF's counsel also agreed, at that same hearing, to see if there

had been any discipline or maintenance involving the crossing from July 8, 2000 until August 10,

2005, and promised it would produce any information to Marcotte. <u>See</u> Discovery Motion Tr. at

14:19-25, 15:1-6 (Court & Saiz); Discovery Motion Tr. at 4:3-6 (Court, Saiz & Lyle). The

Plaintiff's counsel agreed to limit their Interrogatory Number Four to "trouble tickets." Discovery

Motion Tr. at 11:8-13:18 (Court, Lyle, & Saiz).

### 6.   **Ballinger's Inspection.**

On August 29, 2005, the Defendants' expert, Forrest H. Ballinger, visited the crossing site.

<u>See</u> Defendants' Motion for Summary Judgment Dismissing Complaint, or, Alternatively, Partial

Summary Judgments, filed November 2, 2005 (Doc. 85), Exhibit C, Affidavit of Forrest H. Ballinger

¶ 5, at 2. During his visit, Ballinger met with the BNSF Signal Supervisor, Russell Sweet . <u>See</u> <u>id.</u>

Ballinger asked Mr. Sweet to deploy the gates, operate the warning lights, and ring the pedestrian

bell. <u>See</u> <u>id.</u>; Defendants' Motion for Summary Judgment Dismissing Complaint, or, Alternatively,

Partial Summary Judgments, filed November 2, 2005 (Doc. 85), Exhibit C, Ballinger Memo at 1

(dated Sept. 29, 2005). All the equipment was working correctly at that time. <u>See</u> <u>id.</u>

Based in part upon his inspection, Ballinger believed the gates and lights functioned correctly

on July 8, 2001. <u>See</u> <u>id.</u> ¶ 8, at 3. Specifically, Ballinger noted that "the lights located on the right

---

[4] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

hand mast, as well as those mounted on the overhead cantilever, were bright and appeared to be properly aligned down the westbound roadway.  See id. ¶ 6, at 2-3.  There is no indication in the record that the inspection done by Ballinger was the same or similar to the inspection conducted by Farnham.

### 7.    Farnham's Deposition.

On August 30, 2005, Farnham gave a deposition in this matter.  See Memorandum in Support of BNSF Railway and Amtrack's First Motion in Limine, to Exclude Opinions of Larry J. Farnham, and Disqualify Him as Plaintiff's Expert at 9, filed September 15, 2005 (Doc. 56) ("Defendants' Daubert Memo."), Exhibit F, Deposition of Wilfred Farnham, Jr. ("Farnham Depo.") (taken Aug. 30, 2005).  Farnham explained that he is an expert in the equipment that controls railroad grade crossings.  See Farnham Depo at 38:23-39:2.  He has some experience in the electrical engineering aspect or electronic design of gate mechanisms in railroad crossings.  See Farnham Depo. at 41:18-22.  Most of his experience is in the electrical engineering aspect or electronic design of the motion detector equipment at railroad crossings.  See Farnham Depo. at 34:25-41:22.

Given what Farnham based his opinions upon, there is no indication that he activated the warning devices, lights, or crossing arm.  Farnham explained that his opinion about PMD-1s being subject to potential failures was based upon experience that he gained while working on a project regarding motion censors/detectors for railroad crossings.  See Farnham Depo. at 35:4-11, 42:6-23, 47:5-25, 48:1-9.  His opinion regarding the IRM was based upon his inspection of the crossing because he did not see one installed on the day he inspected the crossing.  See Farnham Depo. at 49:3-24.  Farnham reached his conclusion about inadequate gate down time based on the witness statements taken from witnesses at the time of the incident.  See Farnham Depo. at 72:3-74:1-14. Farnham's assumption, that the driver would have seen the gates had twenty seconds or more of

warning time from the time the lights go on until the train gets there, was based upon his experience

at hundreds of crossings, because he had never seen an instance where someone did not slow down

when the gate was down.  See Farnham Depo at 100:11-101:23.  Farnham also noted that generally,

when people see an obstacle in front of them, they slow down.  See Farnham Depo. at 101:24-102:2.

Farnham further noted that he observed impaired site distances at the crossing:

> That is, in the site distance tables that I cited in my report, show what needs to
> happen. He was going say, 30 miles an hour, I don't remember at this point what the
> train speed was, but you'd have to have several hundred feet of no obstructions in the
> site train.  There were trees obstructing his view, which is very obvious, and I didn't
> have to specify it, but there is a Federal law that when you have a main line track like
> this, and you have that site distance obstruction, that you have to have accurate
> warning devices.  And that's all I was point out here that active warning devices are
> essential, and they are essential to work properly for a safe crossing.

Farnham Depo. at 103:16-104:3.  He acknowledged, however, that the issue of site distance is a non-

issue if you have active crossing devices.  See Farnham Depo. at 104:4-7.

Farnham formed no opinions specific to the Alameda crossing on maintenance procedures.

For example, he did not opine on whether the crossing might have been better maintained, the

modification levels of the boards, installation of the PMDs, or the maintenance procedures of the

railroad.  See Farnham Depo. at 107:3-18.  He also acknowledged that he had no opinion whether

the PMD installed at the crossing was more subject to potential failure than any other PMD.  See

Farnham Depo. at 107:3-18.

### 8.    The Defendants' Daubert Motion to Exclude Larry J. Farnham and to Disqualify Him as Marcotte's Expert.

The Defendants filed a motion to disqualify Marcotte's expert on September 15, 2005.

See BNSF Railway and Amtrack's First Motion in Limine to Exclude Opinions of Larry J.

Farnham, and Disqualify Him as Plaintiff's Expert, filed Sept. 15, 2005 (Doc. 55).  One of the

Defendants' arguments for disqualification was that Farnham is subject to a permanent

injunction which prohibits him from offering testimony based upon experience he gained while working for Harmon Industries, Inc. <u>See</u> Defendants' <u>Daubert</u> Memo at 9. Farnham is permitted, however, to "testify or communicate concerning public records and/or documents and things that initially came into [his] possession directly from attorneys representing parties involved in grade crossing issues . . . that [are] delivered to Farnham solely for the purpose of providing consulting and/or expert witness services with respect to those grade crossing issues." Defendants' <u>Daubert</u> Memo. at 9-10 (internal quotations omitted).

Marcotte provided Farnham with the documents concerning the signalization at the Alameda crossing. <u>See</u> Defendants' <u>Daubert</u> Memo. at 15 n. 3. Farnham's area of expertise is in "electrical engineering aspect or electrical design" of the equipment controlling railroad crossings. Defendants' <u>Daubert</u> Memo. at 8 (citing Deposition of Larry Farnham at 30:23-25, 39:1-2, 41:22-21)(Aug. 30, 2005)("Farnham Depo."). Farnham's opinions regarding potential activation failures in the warning systems at the crossing were not based upon BNSF maintenance. <u>See</u> Defendants' <u>Daubert</u> Memo. at 12 n.2 (citing Farnham Depo. at 141:5-14). Farnham also did no studies or tests to determine whether the circuitry installed at the Alameda crossing was subject to a potential failure more than other crossings using similar circuitry. <u>See</u> Defendants' <u>Daubert</u> Memo. at 13. In addition, Farnham concluded that less than twenty-seconds warning time elapsed from the time the warning lights at the crossing began flashing until the train enters the crossing based upon the "impression [he] got from reading all the witness statements." Defendants' <u>Daubert</u> Memo. at 17-18 (citing Farnham Depo. at 144:9-12).

Some of the Defendants' arguments to disqualify or limit Farnham's opinions centered on the basis of his opinions. The Defendants challenged Farnham for basing his opinions on nothing "other than the witnesses' statements in the police report." Defendants' <u>Daubert</u> Memo. at 18.

Farnham also relied, however, upon his July 8th inspection of the crossing in coming to his conclusions.  See Plaintiff's Expert Disclosures and Reports, filed Aug. 23, 2005 (Doc. 53), Confidential Report at 4.  Farnham also noted that "crossing maintenance by the railroad maintenance personnel is a critical factor in maintaining a safe crossing."  Id. at 6.

One of Farnham's conclusions was "[t]he sight distances at the crossings are not satisfactory and proper operation of the active warning devices is essential for a safe crossing."  Id. at 8.  The Defendants challenged that conclusion, because Farnham admitted at his deposition that the issue of sight distances was a non-issue given that "there are active crossing devices at the crossing." Defendants' Daubert Memo. at 21 (citing Farnham Depo. at 103:10-16, 104:4-7).

### 9.    The Defendants' Motion for Partial Summary Judgment.

On September 16, 2005, the Defendants moved for partial summary judgment.  See Defendants' Summary Judgment Motion, filed September 16, 2005 (Doc.57).  The Defendants argued that partial summary judgment was appropriate because the decedent's driver, Fabian Ortega was negligent per se in driving through the crossing while the lights were flashing and the crossing arm of the gate was descending. See Defendants' Summary Judgment Motion ¶ 1, at 1-2.  They also argued Ortega was negligent per se for being under the influence of cocaine and alcohol, and driving on a suspended license at the time of the incident.  See  Defendants' Summary Judgment Motion ¶¶ 2-3, at 2.

In support of their motion, they referenced an affidavit of Bruce Dickinson, an alleged witness to the incident, and toxicology reports on the driver and his passengers, including the decedent. See Defendants' Memorandum Brief in Support of Motion for Partial Summary Judgment that Joseph Ortega's Driver was Negligent Per Se at 2-17, filed Sept. 16, 2005 (Doc. 58).  Marcotte responded that it was unknown, as of the time they filed their response, whether Dickinson's version

of events was supported by the other witnesses to the incident.  See Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment at 1, filed Oct. 18, 2005 (Doc. 71). Marcotte's attorney subsequently filed an affidavit stating that they could not "adequately respond" to the Defendants' Partial Summary Judgment Motion "relating to the claims of negligence per se with regard to obedience to a signal indicating the approach of a train" because the deposition of one of the alleged witnesses to the event was scheduled for October 24, 2005.  Rule 56(f) Affidavit of Counsel for Plaintiff in Response to Defendants' Motion for Partial Summary Judgment at ¶¶ 4, 6, at 2, filed Oct. 18, 2005 (Doc. 72).

Farnham subsequently admitted in an affidavit executed on October 14, 2005, that the bulk of his testimony would be based upon his "work designing and testing railroad crossing devices," and "the sum total of [his] many years experience inspecting and testing these crossings, combined with [his] fundamental knowledge of mechanical engineering and physics." Plaintiff's Response in Opposition to Defendants' Motion in Limine to Exclude and Disqualify Plaintiff's Expert, filed Oct. 17, 2005 (Doc. 69), Exhibit 5, Affidavit of Wilfred L. Farnham ¶¶ 3, 8, at 1-2, 3 (executed on Oct. 14, 2005) ("Farnham Aff.").

BNSF represents, however, that it did not want to settle, and only did so upon the mediator's urging.  See BNSF's Response to Plaintiff's Motion for Relief from Judgment Pursuant to Rule 69(b) for Fraud and BNSF's Request for Attorneys' Fees and Costs Pursuant to 28 U.S.C. § 1927 at 5, filed Jan. 25, 2004 (Doc. 104) ("BNSF's Response"). On November 8, 2005, the parties entered into a settlement.  See BNSF's Response at 5.  On November 16, 2005, the Honorable Judge Richard L. Puglisi, United States Magistrate Judge, entered an order vacating a scheduled settlement conference indicating the parties had reached an amicable settlement.  See Order, filed November 16, 2005 (Doc. 90).  On November 19, 2005 -- unaware that the parties had settled -- the Court

entered its order compelling BNSF to amend its answers to various interrogatories, including Interrogatories Numbered 3, 4, 6, 7, and 14. <u>See</u> Order, filed Nov. 19, 2005 (Doc. 89). That Order was consistent with the Court's rulings at the hearing of August 10, 2005. <u>See</u> <u>id.</u> There is no indication in the record that BNSF amended its interrogatories.

On January 4, 2006, the parties submitted a motion to dismiss. <u>See</u> Stipulation Motion to Dismiss, filed January 4, 2006 (Doc. 99). On January 6, 2006, the Court entered the Order of Dismissal that the parties had submitted. <u>See</u> Order of Dismissal With Prejudice, filed January 6, 2006 (Doc. 100).

### 10.    <u>Rule 60(b) Motion.</u>

In this motion, filed on December 22, 2006, Marcotte requests that the Court, pursuant to rule 60(b) of the Federal Rules of Civil Procedure, vacate the Order of Dismissal entered on January 6, 2006, and reopen the case against BNSF. Marcotte argues that the Court should set aside the judgment because of BNSF's fraud, misrepresentation, and other misconduct related to the Sweet audit. Additionally, Marcotte contends that the Court should set aside the judgment because of other reasons justifying relief, including the possibility that BNSF's counsel engaged in, directed, or was aware of the fraud, misrepresentation, and other misconduct. Marcotte asks that, in addition to reopening the judgment on the grounds set forth in rules 60(b)(3) and (6), the Court also inquire and determine whether BNSF's counsel are also implicated in the procurement of the fraud. Marcotte also asks the Court to determine whether she should be entitled to assert new or additional claims for intentional spoliation of evidence, sanctions, and punitive damages.

In BNSF's response to Marcotte's 60(b) motion, it admits that the work done by Sweet and other BNSF employees "may have repaired a mirror or a light on one of the crossing gate arms as part of the inspection." BNSF's Response at 2. BNSF argues that the "Plaintiffs and their counsel

rationally could not have believed that on July 8, 2005, the date the Movant's expert went to the crossing, that it was in the same condition as it was four years earlier on July 8, 2001 (the accident date), and that the gates, lights, and mirrors had not been damaged and replaced." BNSF's Response at 8.   BNSF also asserts that BNSF has "performed dozens of federally-mandated periodic inspections (all of which required as-needed replacement of gate lights and adjustment of reflectors) all in the intervening years since the collision occurred."   BSNF Response at 2.   BNSF further asserts that, even if the conduct described by Sweet was a discovery abuse or non-disclosure, it would not be adequate grounds for relief under 60(b).   See BNSF Response at 9.

BNSF also contends that Marcotte's remaining damages claims for hedonic and loss of earning capacity damages for the decedent Joseph Ortega were not "meritorious." BNSF Response at 12 n. 4. Specifically,  BNSF argues that Marcotte's decedent, Joseph Ortega,  and his fellow car occupants were under the influence of morphine, cocaine, codeine, and alcohol at the time of the incident.   See BNSF Response at 2 (stating that it is "undisputed that passenger Plaintiff Joseph Ortega, along with his fellow occupants (all of whom died in the collision), had ingested varying combinations of morphine, cocaine, codeine, and alcohol prior to the collision."). BNSF characterizes the decedent as "a twice-convicted felon and an adjudicated repeat offender."   Id.

BNSF argues that Joseph Ortega was never employed, never earned a wage, and was ill at the time of his death.   BNSF states "[t]he eyewitnesses agreed that the Ortega vehicle swerved around the crossing gate, directly into the path of the oncoming train."   BNSF Response at 3.   BNSF argues that, "[g]iven the frivolous nature of the case, BNSF and Amtrak were reluctant to settle. The settlement, at a nuisance value of $30,000, only occurred because of the urging of mediator Kim

Udall." Id.[5]

The Court held a hearing on this matter on May 1, 2007.  See Clerk's Minutes, filed May 1, 2007 (Doc. 117).  Neither Marcotte nor BNSF presented any new evidence regarding Marcotte's motion.  See Transcript of Hearing (taken May 1, 2007)("Tr."); Clerk's Minutes, filed May 1, 2007 (Doc. 117).  Thus, Marcotte did not identify when she discovered Sweet's statement or argue that it constituted newly discovered evidence under rule 60(b)(2); Marcotte grounded her motion on rule 60(b)(3) and 60(b)(6).  See Tr. at 30:13-25, 31:1-2 (Lyle); Marcotte's 60(b) Motion at 1, ¶ 10, at 3.

Marcotte also did not explain how she had obtained Sweet's statement.  See Tr. at 3:23-25 (Lyle).  Marcotte did not know if the statement was taken under oath.  See Tr. at 7:19-20. Marcotte's counsel conceded that, if the alleged audit by BNSF employees was routine maintenance, then 60(b) relief would not be appropriate, because a party in litigation does not always know everything when it makes the calculus to settle.  See Tr. at 9:22-25, 8:1-10 (Court & Lyle). Marcotte's counsel also said that the primary reasons Marcotte decided to settle were that the witnesses to the incident "backed away from what they had told the police" and that, in the expert's opinion, the only problem related to the crossing involved the amount of time it took the gates to descend.  See Tr. at 8:25, 9:1-15 (Court& Lyle).

On the other hand, BNSF did not dispute the veracity or accuracy of Sweet's statement in

---

[5]BNSF also asserts that the Court has ancillary jurisdiction over the settlement to enforce it and that the Court should enforce the settlement between the parties.  See BNSF Response at 13. The Court has, however, no ancillary jurisdiction over the settlement agreement of the parties, because the Court did not explicitly retain such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion. See Order, filed January 6, 2006 (Doc. 100); McKay v. United States, 207 Fed.Appx. 892, 895, 2006 WL 3291757(10th Cir. 2006) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-81 (1994) (stating "[o]nce a lawsuit is settled and dismissed, the district court does not generally have "ancillary jurisdiction to enforce the parties' settlement agreement. A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.").

the FELA proceeding. Moreover, BNSF did not state that its counsel or its experts were unaware of Sweet's visit. BNSF referred to its early <u>Daubert</u> motion to exclude Marcotte's expert. <u>See</u> Tr. at 14:13-25, 15:1-25, 16:1 (Atkinson). Neither side asked for additional time to conduct discovery or to present further evidence on Marcotte's 60(b) Motion.

At the hearing on Marcotte's 60(b) motion, BNSF's counsel argued that none of Marcotte's outstanding discovery requests would have covered the information contained in Sweet's statement. <u>See</u> Tr. at 13:7-25; 14:1-15 (Court & Atkinson). BNSF's counsel represented that there was no discovery request advanced by Marcotte's counsel about later maintenance to the crossing site. <u>See</u> Tr. at 13:21-25, 14:1 (Court & Atkinson). Marcotte's counsel could not recall, however, if there was outstanding discovery at the time of the expert's visit to the crossing at the time of the hearing, but noted that Marcotte relied upon the Defendants' representations in discovery about maintenance of the crossing. <u>See</u> Tr. at 8:17-24 (Lyle).

BNSF's counsel also reiterated that, in any case, allegations of discovery abuse such as those here do not rise to the level of fraud between the parties. <u>See</u> Tr. 23:1-3 (Atkinson). After the hearing, Marcotte's counsel sent, by facsimile transmission, a letter to the Court that outlined the discovery requests sent to BNSF regarding the equipment at the crossing. <u>See</u> Letter from James P. Lyle to the Court (dated May 1, 2007), filed May 7, 2007 (Doc. 118). The requests that Mr. Lyle included in his letter to the Court were interrogatories numbered two, three, and ten. <u>See</u> Mr. Lyle's May 1, 2007 Letter at 1.

BNSF's counsel responded to Marcotte's counsel's letter to the Court with its own letter to the Court. <u>See</u> Letter from Clifford K. Atkinson to the Court (dated May 2, 2007), filed May 7, 2007 (Doc. 119). In that letter, BNSF's counsel objected to Marcotte "trying to advance this position at this junction." <u>Id.</u> at 2. BNSF's counsel also relied upon the Court's order regarding

Marcotte's earlier motion to compel, which stated in a footnote that: "Counsel represented to the Court that all other [discovery] issues had been resolved." Id. at 4 (citing to Order, filed Nov. 9, 2005 (Doc. 89)). See Order, filed Nov. 9, 2005 (Doc. 89) (stating that consistent with the Court's ruling at the hearing on the motion and for the reasons given at the time of that hearing, it would partially grant Marcotte's motion to compel BNSF to amend its discovery answers).

## LAW REGARDING REOPENING JUDGMENTS

Relief under rule 60(b) should apply only in extraordinary circumstances when it is appropriate to accomplish justice. See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 864 (1988) (citing Ackermann v. United States, 340 U.S. 193 (1950), and Klaprott v. United States, 335 U.S. 601, 614-15 (1949)). Rule 60(b)

> attempts to harness a blend of centrifugal and centripetal forces. On the one hand, the rule must be so construed so as to recognize the importance of finality as applied to court judgments. On the other hand, the rule must be construed so as to recognize the desirability of deciding disputes on their merits. The need to harmonize these competing policies has led courts to pronounce themselves disinclined to disturb judgments under the aegis of Rule 60(b) unless the movant can demonstrate that certain criteria have been achieved.

Local No. 59 v. Superline Transp. Co., Inc., 953 F.2d 17, 19-20 (1st Cir. 1992). The criteria governing relief under 60(b) is that such relief is "extraordinary and may only be granted in exceptional circumstances." Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999)(internal quotations omitted).

There are different time limits set for requesting relief under the various clauses of rule 60(b). "Rule 60(b) provides that a motion under the Rule shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgement, order or proceeding was entered or taken." United States v. Buck, 281 F.3d 1336, 1341 (10th Cir. 2002). A one-year time bar applies to motions brought under rule 60(b)(3). See id. There are no time limits for actions

under 60(b)(6).  See id. at 1342 ("There is no set time limit for filing an independent action, although relief may be barred by laches. [. . . ] There is no time limit for [fraud-upon-the-court] proceedings nor does the doctrine of laches apply.").

### A.    60(b)(2): RELIEF FROM JUDGMENT FOR NEWLY DISCOVERED EVIDENCE

For newly discovered evidence to justify reopening judgment under rule 60(b)(2), a movant must satisfy the following conditions: (i) the evidence was newly discovered since the trial; (ii) the movant was diligent in discovering new evidence; (iii) the newly discovered evidence is not merely cumulative or impeaching; (iv) the newly discovered evidence is material; and (v) a new trial with the newly discovered evidence would probably produce a different result.  See Graham v. Wyeth Lab., 906 F.2d 1399, 1416 (10th Cir. 1990).  A movant cannot rely upon information that was either available to a court before the issuance of a final judgment or discoverable with due diligence.  See Beugler v. Burlington N. & Santa Fe Railway Co., 490 F.3d 1224, 1227 (10th Cir. 2007) (holding that a ruling of an administrative board was not newly discovered evidence sufficient to justify relief under rule 60(b)(2) because it was irrelevant to the dispositive question whether and to what extent Burlington Northern owed a duty to the movant, even that administrative ruling was entered two months after the court granted summary judgment in favor of Burlington Northern); Gardner v. United States, 446 F.2d 1193, 1194-95 (10th Cir. 1971) (holding that, although a patent was not known to the movant before the final judgment, a diligent patent search before trial would have disclosed it).  Relief under 60(b)(2) is justified if the new evidence could have been discovered only after trial.  See Graham v. Wyeth Lab., 906 F.2d at 1417.

### B.    60(b)(3):   RELIEF   FROM   JUDGMENT   FOR   FRAUD, MISREPRESENTATION, OR MISCONDUCT BY AN OPPOSING PARTY

The party relying upon this provision of rule 60(b) must "show clear and convincing proof

of fraud, misrepresentation, or misconduct." Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1290 (10th Cir. 2005) (internal quotations omitted). The Tenth Circuit has adopted a rigorous standard for rule 60(b)(3),  because rule 60(b)(3)'s purpose is to provide relief from judgments which were unfairly obtained. See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1290, 1292 (holding that there was no intent to defraud nor evidence of a deliberate plan or scheme to interfere with the plaintiff's case where the plaintiff attempted to prove fraud by showing defendant's failure to produce documents).  A claim of misconduct will not lie when all the movant can prove is that the nonmovant "played hardball litigation." Yapp v. Excel Corp., 186 F.3d 1222, 1231 (10th Cir. 1999).

While the United States Court of Appeals for the Tenth Circuit has emphasized that the purpose of, and the requirements under, rule 60(b)(3) and 60(b)(6) are distinct, in Yapp v. Excel Corp., the Tenth Circuit pulled some of rule 60(b)(6)'s requirements into its analysis of rule 60(b)(3), see Yapp v. Excel Corp., 186 F.3d at 1231.  Accordingly, even for rule 60(b)(3), a movant must show an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme.  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291 ("Intent to defraud is an 'absolute prerequisite' to a finding of fraud on the court" which requires "evidence of an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme.")(internal citations and quotations omitted).  Intent to defraud is an absolute prerequisite. See id. ("Intent to defraud is an 'absolute prerequisite' to a finding of fraud on the court." (quoting Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir.1995)).  Given that rule 60(b)(3)'s language includes misrepresentations  or other misconduct of an adverse party, as well as fraud, the Tenth Circuit's requirement that there be an intent to defraud the court, and intent to deceive, may be narrowing rule 60(b)(3)'s scope to no more than what rule 60(b)(6) covers.  Given

-23-

that there are different time limits on the filing of a rule 60(b)(3) motion and a rule 60(b)(6) motion, the Tenth Circuit's decision in Yapp v. Excel Corp. narrows the utility of rule 60(b)(3). The Tenth Circuit itself has noted this problem. See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291-92.

A fraud-upon-the-court claim requires a "consciousness of wrongdoing – what can properly be characterized as a deliberate scheme to defraud -- before relief from final judgment is appropriate." Robinson v. Audi Aktiengesellschaft, 56 F.3d 1259, 1267 (10th Cir. 1995). In Yapp v. Excel Corp., the Tenth Circuit described the movant's burden under 60(b)(3) as proving by clear-and-convincing evidence that the nonmovant acted with "an intent to deceive or defraud the court by means of a deliberately planned and carefully executed scheme." 186 F.3d at 1231. In 2002, the Tenth Circuit clarified the relationship between fraud-upon-the-court claims and relief under rule 60(b). See United States v. Buck, 281 F.3d 1336, 1341-1344 (10th Cir. 2002).

In United States v. Buck, the Tenth Circuit stated that fraud-upon-the-court claims, as authorized under rule 60(b), may be brought only by an independent action or to invoke the inherent power of a court. See United States v. Buck, 281 F.3d at 1341. The decision in United States v. Buck did not rely upon rule 60(b)(3), because the movant brought the claim under 60(b)(6) to avoid the time bar of one year. See United States v. Buck, 281 F.3d at 1341; Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1291 (10th Cir. 2005). The Tenth Circuit also clarified that "the clear import of the language of clause (b)(6) is that the clause is restricted to reasons other than those enumerated in the previous five clauses." United States v. Buck, 281 F.3d at 1341.

In 2005, the Tenth Circuit in Zurich N. Am. v. Matrix Serv., Inc., acknowledged the tension in prior cases regarding the appropriate standard governing motions for relief under 60(b)(3). See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291. The Tenth Circuit explained:

> In this case, Zurich argues that the district court applied the wrong standard due to

its reliance on United States v. Buck. Zurich contends Buck is inapposite because it "did not even concern a motion under Rule 60(b)(3), much less purport to set forth the standard for such a motion . . . ." (Appellant's Br. at 33.) We agree. To be sure, Buck was clearly a fraud on the court case, brought to avoid the time bar of Rule 60(b)(3). We specifically referred to the words of Rule 60(b)'s savings clause that "[t]his rule does not limit the power of a court to entertain an independent action to relieve a party from judgment, order, or proceeding, . . . or to set aside a judgment for fraud upon the court." Our agreement, however, provides cold comfort because in Yapp, we applied the heightened fraud on the court standard of Buck and Robinson to misconduct claims under 60(b)(3).

Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291. It also noted that other circuits have applied a lesser standard under 60(b)(3), but that "[n]evertheless, we, like the district court, are bound by prior panel decisions." Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291 n. 8.  In Zurich N. Am. v. Matrix Serv., Inc., the movant argued that the trial court mistakenly applied the heightened fraud-on-the-court standard of both United States v. Buck and Robinson v. Audi Aktiengesellschaft to a motion under rule 60(b)(3).  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291.  The Tenth Circuit mentioned, however, that it was bound by the prior panel decisions to apply the heightened fraud-on-the-court standard to misconduct claims under rule 60(b)(3).  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291 n.8.

There is rarely direct evidence of intent.  The plaintiff must often rely upon circumstantial evidence of intent. "As a general rule the law makes no distinction between direct and circumstantial evidence."  Tenth Circuit Pattern Jury Instructions Civil §1.07, at 15 (2005).  See United States v. Rahseparian, 231 F.3d 1267, 1271-72 (10th Cir. 2000); United States v. Ortiz-Ortiz, 57 F.3d 892, 895 (10th Cir. 1995).

The law simply requires that the factfinder find the facts in accord with all the evidence in the case, both direct and circumstantial.  Tenth Circuit Pattern Jury Instructions Criminal § 1.07, at 15.  See United States v. McIntyre, 997 F.2d 687, 702-703 n. 16-18 (10th Cir. 1993).  The factfinder

is "permitted to draw reasonable inferences from the testimony and exhibits . . ."– inferences it feels "are justified in light of common experience."  Tenth Circuit Pattern Jury Instructions Criminal § 1.07, at 15.  An inference is a conclusion that "reason and common sense" may lead the factfinder "to draw from the facts that have been proven."  Id.  By permitting such reasonable inferences, the factfinder may make "deductions and reach conclusions that reason and common sense" lead the factfinder to draw from the facts that have been established by the testimony and evidence in the case."  Id.

Intent may be inferred from conduct.  "In other words, some conduct may by its very nature contain the implications of the required intent: the natural and foreseeable consequences may warrant the inference."  Glaziers Local Union 558 v. Nat'l Labor Relations Board, 787 F.2d 1406, 1413 (10th Cir. 1986) (discussing inferring intent  in the context of illegal discriminatory motives).  See United States v. Schuler, 458 F.3d 1148, 1152 (10th Cir. 2006) (stating that, "[b]ecause direct proof of fraudulent intent often is unavailable, courts have long permitted fact finders to rely on a variety of circumstantial evidence, including evidence of actual or contemplated harm, to infer such intent."); Torres v. Mullin, 317 F.3d 1145, 1154 (10th Cir. 2003) (stating that "a jury may infer intent from [a defendant's] objective acts and may also infer that a defendant intended "the consequences which he announce[ed] a desire to accomplish.") (internal quotations omitted).  Intent may also be inferred from circumstantial evidence that shows attempts to conceal an activity.  See United States v. Marshall, 179 Fed.Appx. 516, 518 (10th Cir. 2006) ("A variety of circumstantial evidence has been held relevant to infer fraudulent intent. Intent may be inferred from evidence that the defendant attempted to conceal activity. Intent to defraud may be inferred from the defendant's misrepresentations.")(internal quotations omitted).

Failure to disclose information requested during discovery may constitute misconduct under

rule 60(b)(3), but the misconduct, to be a basis for vacating a final judgment, usually requires the violation of a specific discovery request or order.   See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1292 (noting that it was unclear that a defendant's failure to produce documents impaired the plaintiff's ability to present its case when the plaintiff failed to request the documents during discovery, even though it knew of their existence); Abrahamsen v. Trans-State Exp., Inc., 92 F.3d 425, 428-29 (6th Cir. 1996).   Before, however, the court may order relief under rule 60(b)(3) as a result of discovery misconduct, "the challenged behavior must have substantially interfered with the aggrieved party's ability to fully and fairly to prepare for and proceed at trial." Woodworker's Supply, Inc. v. Principal Mut. Life, 170 F.3d 985, 993 (10th Cir. 1999).   On the other hand, rule 60(b)(3) does not require the withholding information in discovery to be "of such a nature as to alter the result in the case." Rozier v. Ford Motor Co., 573 F.2d 1332, 1339 (5th Cir. 1978).

Deliberate suppression of a requested document can also justify relief under rule 60(b)(3). See Rozier v. Ford Motor Co., 573 F.2d at 1332 (holding the defense's suppression of a cost/benefit analysis report prepared by a defendant's engineers prevented the plaintiff from fairly and accurately presenting her case despite the fact that the plaintiff expressed intention to rely on fourteen theories, because the disclosure of the report would have made a difference in the way that the plaintiff's counsel approached the case or prepared for trial).   "The admissibility of evidence is irrelevant in the discovery process so long as the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Id. at 1342 (citing to Fed. R. Civ. P. 26(b)(1)). "Our system of discovery was designed to increase the likelihood that justice will be served in each case, not to promote principles of gamesmanship and deception in which the person who hides the ball most effectively wins the case." Abrahamsen v. Trans-State Exp., Inc., 92 F.3d at 428-29.

BNSF argues that Marcotte must also assert a meritorious claim to obtain relief under

60(b)(3). Although other courts have imposed the showing of a meritorious claim or defense as a precondition to relief under rule 60(b), see Pease v. Pakhoed Corp., 980 F.2d 995, 998 (5th Cir. 1993); Teamsters, Chauffeurs Local No. 9 vs. Superline Tr., 953 F.2d 17, 20 (1st Cir. 1992), the Tenth Circuit has not done so.   Those courts believe this requirement is an additional "sentry" guarding the gateway to rule 60(b) relief so that the trial court has "reason to believe that vacating the judgment will not be an empty exercise."   Teamsters, Chauffeurs Local No. 9 vs. Superline Tr., 953 F.2d at 20.  The Tenth Circuit imposes this further requirement only in the context of default judgments.   See In re Stone, 588 F.2d 1316, 1319 (10th Cir. 1978) ("In the case of default judgments, courts have established the further requirement that a movant demonstrate the existing of a meritorious defense.").  The issues involved in default judgments and motions for relief under rule 60(b) "are framed and resolved differently."   In re Stone, 588 F.2d at 1319.

## C.   60(b)(6): RELIEF FROM JUDGMENT FOR ANY OTHER REASON THAT JUSTIFIES RELIEF

Relief under 60(b)(6) is difficult to obtain and "is appropriate only when it offends justice to deny such relief." Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1293 (10th Cir. 2005).  Claims of fraud between parties are not included as a ground for relief under rule 60(b)(6).  See United States v. Buck, 218 F.3d 1336, 1341 (10th Cir. 2002).  Rule 60(b) authorizes two "avenues for relief from fraud upon the court." United States v. Buck, 218 F.3d 1336, 1341 (10th Cir. 2002).  A fraud on the court claim can only be brought under Rule 60(b) by asking the Court to entertain an independent action or by invoking the court's inherent power to set aside a judgment procured by fraud upon the court. See id. at 1341-42.  "Ordinarily, therefore, claims of fraud between the parties are brought under Rule 60(b)(3)  while claims of fraud on the court are brought as an independent action" cognizable under rule 60(b)(6).  Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291.

Relief under rule 60(b)'s categories are mutually exclusive.  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1293. (10th Cir. 2005).

An independent action is available only to prevent a grave miscarriage of justice.  See Tates v. Beggerly, 524 U.S. 38, 47 (1998); United States v. Buck, 218 F.3d at 1341.  The second route invokes "the inherent power of a court to set aside its judgment if procured by fraud upon the court." United States v. Buck, 218 F.3d at 1341.  Proof of fraud upon the court must be by clear-and-convincing evidence.  See id. at 1342.  All doubts must resolved in favor of the finality of the judgment.  See Weese v. Schukman, 98 F.3d 542, 552 (10th Cir. 1996).  It is also essential "that there be a showing of conscious wrongdoing -- what can properly be characterized as a deliberate scheme to defraud -- before relief from a final judgment is appropriate."  United States v. Buck, 218 F.3d at 1342.  See Robinson v. Audi Aktiengesellschaft, 56 F.3d at 1267 ("Intent to defraud is an 'absolute prerequisite' to a finding of fraud on the court.").

Fraud-upon-the court claims are difficult to prove, because they usually involve only the most egregious conduct, "such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated."  Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d 1281, 1291 (10th Cir. 2005). "[T]he fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court."  United States v. Buck, 281 F.3d 1336, 1342 (10th Cir. 2002).  "Less egregious conduct, such as nondisclosure to the court of facts allegedly pertinent to the matter before it, will not ordinarily rise to the level of fraud on the court."  Weese v. Schukman, 98 F.3d at 552-53 (internal quotations omitted).

## D.    RULE 60(b) AND SETTLEMENTS

Nothing in the language of rule 60(b) precludes an action for fraud in connection with a settlement.  See Cresswell v. Sullivan & Cromwell, 668 F.Supp. 166, 170 (S.D.N.Y. 1987).  Cf.

Yapp v. Excel Corp., 186 F.3d at 1230-32 (applying rule 60(b) to a motion brought for relief from dismissal with prejudice following a settlement agreement).  "[T]he importance of finality does not override the important policy of deterring fraud, in the settlement of lawsuits as well as other transactions." Cresswell v. Sullivan & Cromwell, 668 F.Supp. at 172. Rule 60(b) does not, however, govern a situation in which the plaintiff seeks to affirm a settlement but add damages for alleged discovery violations. See Cresswell v. Sullivan & Cromwell, 668 F.Supp. at 169, 172.

Although some courts have imposed a heightened standard on movants seeking relief from judgments as a result of settlement, see Rand Int'l.  Leisure Products, Ltd. v. TekSource, L.C., 1998 WL 372356 at *1 (E.D.N.Y. 1998); In re Huff, 118 Bankrp. R. 146, 148 (S.D. Fla. 1990) (stating that a stricter standard is applied to rule 60 motions because settlements are favored in federal law and the prompt resolution of claims and disputes is of particular importance in a bankruptcy reorganization); Nemaizer v. Baker, 793 F.2d 58, 63 (2d Cir. 1986); United States Steel Corp. v. Fraternal Ass'n. of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979),  the Tenth Circuit has not, see Yapp v. Excel Corp., 186 F.3d 1222, 1231(10th Cir. 1999)[6]. The Tenth Circuit agrees, however, with other courts that a movant cannot obtain relief under rule 60(b) because he "simply misunderstands or fails to predict the legal consequences of his deliberate acts."  Yapp v. Excel Corp., 186 F.3d at 1231.  See United States v. Bank of New York, 14 F.3d 756, 759 (2d Cir. 1994); Schwartz v. United States, 976 F.2d 213, 218 (4th Cir. 1992) (noting that when a litigant makes a calculated, free, and deliberate choice to settle a case he or she "weighs the chance of success against the probable cost of achieving that success through further litigation, all based on whatever limited information is available at the time");  In re Astroglass Boat Co., 32 Bankr. L. Rep. 538, 544

_____

[6]The heightened fraud-upon-the-court standard is applied to all rule 60(b)(3) claims, not just those arising from settlement.  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1281 n.8.

(Bankr. M.D. Tenn. 1983) (holding that unsecured creditors' settlement was not the result of a mistake but rather "the culmination of a series of deliberate actions by both parties."); Good Luck Nursing Home, Inc. v. Harris, 636 F.2d 572, 577 (D.D.C. 1980) ("Rule 60(b) cannot, therefore, be employed simply to rescue a litigant from strategic choices that later turn out to be improvident."); In re Master Key Antitrust Litigation, 76 F.R.D. 460, 464 (D.C. Conn. 1977) (holding that no relief under 60(b)(6) was appropriate when the parties "bore the risks of litigation equally"; "If a party makes a conscious and informed choice of litigation strategy, he cannot seek extraordinary relief merely because his assessment of the consequences was incorrect."); Robinson v. E.P. Dutton & Co., 45 F.R.D. 360, 361 (S.D.N.Y. 1968) (noting that a movant cannot obtain relief under 60(b) whenever an additional term is demanded by one party but not accepted by the other, especially when that term is probably redundant of the settlement agreement itself).  Misrepresentations during the course of settlement regarding discovery can be a valid basis for relief under rule 60(b) if the movant relied upon the statements in deciding to settle.  See Conerly v. Flower, 420 F.2d 941, 943 (8th Cir. 1969) (holding that it was proper to grant relief under 60(b)(3) when the plaintiff and her counsel relied upon the defendants' misrepresentations regarding amount of coverage available in deciding to settle the case when the plaintiff discovered the misrepresentation approximately seven months after the case had been resolved); Bandai Am., Inc. v. Bally Midway Mfg. Co., 775 F.2d 70, 72-74 (3d Cir. 1985) (holding that a party who surrendered further discovery rights in a settlement agreement was not entitled to reopen judgment where that relinquishment was not causally related to any alleged misrepresentations by opposing counsel).

## RULE 26

Rule 26(b) of the Federal Rules of Civil Procedure grants parties the ability to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party,

including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed. R. Civ. P. 26(b). "Rule 26 allows a party to obtain discovery of any matter, not privileged, that is relevant to the claims or defenses of any party in the litigation. The rules pertaining to discovery are to be liberally construed." Leviton Mfg. Co., Inc. v. Nicor, Inc., Nos. CIV 04-0424, CIV 04-1295, 2006 WL 4061163 at *4-5 (D.N.M. Sept. 8, 2006)(Browning, J.). "Pursuant to rule 26(e), a party is under a duty to supplement a rule 26(a)(2)(B) expert report 'if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties.'" Leviton Mfg. Co., Inc. v. Nicor, Inc., 2006 WL 4061163 at *4 (quoting Fed. R. Civ. P. 26(e))(internal quotations omitted).

## ANALYSIS

When the Court receives a rule 60(b) motion under these circumstances, the Court must determine whether the movant is suffering from a severe case of settlement remorse or there has been fraud. Here, there is clear-and-convincing evidence that BNSF's employees intentionally eliminated or altered evidence just days before Marcotte's expert arrived to inspect the warning systems at the crossing. There is not, however, sufficient evidence -- clear-and-convincing or otherwise -- that Marcotte's expert would have reached materially different conclusions about the crossing equipment if Sweet had not changed the crossing's warning light-mirror. Moreover, there is insufficient evidence that Marcotte, even if she had known about Sweet's changes, would have not settled. Accordingly, under these circumstances, the Court concludes that Marcotte has not met the Tenth Circuit's high standards for showing fraud, misrepresentation, and/or misconduct.

## I.  THE COURT WILL NOT SCHEDULE ANOTHER HEARING TO INVESTIGATE THE ALLEGED 60(b) VIOLATION .

"The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question." Universal Oil Products, Co. v. Root Refining Co., 328 U.S. 575, 580 (1946). Integral to this power is the ability of a federal court to bring before it all who may be affected by the outcome of its investigation. See id.  A hearing in the Court regarding a request for relief under rule 60(b) is "quite appropriate, complete, and adequate as a means of developing the pertinent facts." Consolidated Gas & Equip. Co. of America v. Carver, 257 F.2d 111, 114 (10th Cir. 1958).

Sweet's testimony provided sufficient evidence for the Court to schedule a hearing to determine the nature and extent of the fraudulent conduct.  The Court, however, held one hearing, and no one presented additional evidence or said that there was more evidence to present. The Court could, on the record before it, schedule another hearing to investigate the alleged 60(b).  No one is requesting another hearing.  The Court believes, therefore, it should proceed to decide the motion on the record that the parties have presented in their briefing and at the hearing on Marcotte's 60(b) Motion.

## II.  THE GAPS IN THE COURT'S KNOWLEDGE DO NOT PRECLUDE RESOLUTION OF THIS MOTION.

There is much that the Court does not know that it would prefer to know before making the decision that it must make to decide the motion.  For example, the Court would like to have specific details about the Sweet statement, including when, where, and how it was made and obtained by the Plaintiff.  The Court would also like to know whether there are in existence any other statements by BNSF's employees that confirm the crossing audit in anticipation of the inspection by Marcotte's expert which Sweet discusses in his statement.

Because there is clear-and-convincing evidence that such an audit occurred, the Court would like to know everything that Sweet and his crew did to the crossing during the site visit. The Court would also like to know whether Farnham activated the warning lights. Further, the Court would like to know whether Marcotte and her expert would not have settled if she had known about Sweet's audit. And of particular concern is the issue whether BNSF's attorneys were aware of, participated in, or counseled the alleged actions of BNSF's employees that Sweet discusses in his statement during the FELA proceedings.

While more information would always be helpful to the Court in making a rule 60(b) decision, by the very nature of the situations that present themselves on such motions, all the facts may not be available. Some of the Court's questions may have to await further discovery and development, or never be fully known. The more material question is whether the Court has sufficient information to decide the rule 60(b) motion and, if so, whether that information meets the high standards that the Tenth Circuit has adopted for reopening a case. The Court concludes that Marcotte has not presented sufficient evidence, clear-and-convincing or otherwise, to satisfy rule 60(b)'s requirements for reopening the case.

## III.   MARCOTTE HAS NOT ARGUED OR SHOWN THAT THE SWEET STATEMENT CONSTITUTES NEWLY DISCOVERED EVIDENCE SATISFYING THE REQUIREMENTS OF RULE 60(b)(2).

Marcotte has not argued that Sweet's statement in the FELA proceeding is newly discovered evidence nor has she attempted to justify the motion under rule 60(b)(2). Marcotte has not attempted to meet the requirements for a rule 60(b)(2) motion. Accordingly, the Court will not rest its decision on rule 60(b)(2).

**IV.     BNSF'S CONDUCT IS INSUFFICIENT UNDER RULE 60(b)(3) TO JUSTIFY RELIEF FROM THE COURT'S FINAL JUDGMENT OF JANUARY 6, 2006.**

The Court believes Marcotte has presented the Court with clear-and-convincing evidence of fraud, misrepresentation, and/or misconduct by Sweet and perhaps other BNSF employees. A corporation may only act through its employees. See United States v. Dye Const. Co., 510 F.2d 78, 82 (10th Cir. 1975); Knox v. First Sec. Bank of Utah, N.A., 206 F.2d 823, 826 (10th Cir. 1953). Here, there is strong evidence that Sweet knew about the lawsuit, knew what was at issue, and then intentionally changed the evidence before Marcotte's expert could look at it. Because, however, the evidence is weak or nonexistent that BNSF's fraud and misconduct substantially altered Marcotte's settlement calculus Marcotte should not obtain relief under rule 60(b)(3).

**A.     BNSF INTENDED TO ENGAGE IN MISCONDUCT.**

BNSF's alteration of evidence through the audit that Sweet and his crew conducted -- during the discovery phase of this case -- evidences an intent to deceive or defraud the Court and Marcotte by means of a deliberately planned and carefully executed scheme to alter the crossing before the visit by Marcotte's experts, resulting in Farnham and Ballinger concluding there was no problem with the crossing and probably testifying to that conclusion. Marcotte then surrendered further discovery rights on May 17, 2007. See Settlement Agreement at ¶¶ 1, 9 at 2, 5, 9; Tr. at 12:6-15 (Atkinson). Marcotte's counsel stated that the decision to settle was predicated on the witnesses to the incident backing away from what they had told the police and the expert's opinion that the only defect in the crossing related to the amount of time it took the gates to descend. See Tr. at 8:25, 9:1-15 (Court & Lyle).

When Sweet and his crew audited the crossing, they knew Marcotte's expert was preparing to inspect it in connection with this litigation. Sweet explained the purpose of the audit was "[a]

pending lawsuit . . . we had a meeting scheduled with the plaintiff's attorney with their expert witness and we just wanted to audit the crossing prior to them getting out there to make sure there wasn't anything we needed to take care of before their expert witness seen it."  Sweet Statement at 17:137.  Sweet described the work done: "You just walked down the road, at that you kind of go, depending on footage or speed of traffic, you go so many feet out to try and focus the light where you get the best, the bright light at a certain distance from the crossing."  Sweet Statement at 15:115. Neither Marcotte's counsel nor her expert was informed or advised that BNSF employees had altered the mirror in the warning-light equipment at the scene before the inspection by Marcotte's expert.  See Marcotte's 60(b) Motion ¶ 7, at 3.

Although Sweet did not expressly state that his crew intended to alter the crossing so that Farnham and/or Ballinger would not find any defect it in, he comes very close to such an admission. See Sweet Statement at 17:137.  Moreover, the Court can infer his intent as a BNSF employee from his statements and conduct.  See Glaziers Local Union 558 v. Nat'l Labor Relations Board, 787 F.2d 1406, 1413 (10th Cir. 1986).  The "natural and foreseeable consequences" of Sweet and his crew's actions in doing a complete audit on the crossing in anticipation of Farnham's visit would be to alter the crossing and the defects, if any, before the visit of a retained expert.  Sweet's explanation of the audit's purpose evidences an intent to alter the crossing, to materially impact Farnham's inspection and conclusions regarding the crossing-warning system, and to influence his court testimony about the crossing.

## B.  BNSF'S MISCONDUCT DID NOT SUBSTANTIALLY CHANGE MARCOTTE'S SETTLEMENT CALCULUS.

Misrepresentations and misconduct made during the course of settlement regarding evidence and discovery can be a valid basis for relief under rule 60(b) if the movant relied upon the

misrepresentations in deciding to settle.  See Conerly v. Flower, 420 F.2d 941, 943 (8th Cir. 1969); Bandai Am., Inc. v. Bally Midway Mfg. Co., 775 F.2d 70, 72-74 (3d Cir. 1985).  Misconduct, fraud, or misrepresentation is not enough.  See Woodworker's Supply, Inc. v. Principal Mut. Life, 170 F.3d at 993 (stating that, before the court may order relief under rule 60(b)(3) as a result of discovery misconduct, "the challenged behavior must have substantially interfered with the aggrieved party's ability to fully and fairly to prepare for and proceed at trial."); Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1292 (noting that it was unclear that a defendant's failure to produce documents impaired the plaintiff's ability to present its case when the plaintiff failed to request the documents during discovery, even though it knew of their existence).  The movant must also establish that the misconduct would have made a difference at trial or in the settlement.  See Woodworker's Supply, Inc. v. Principal Mut. Life, 170 F.3d at 993; Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1292.

The Tenth Circuit has imposed upon the movant a burden of proving fraud, misconduct, or misrepresentation by clear-and-convincing evidence to vacate the judgment and order of dismissal with prejudice, and reopen the case.  While the Tenth Circuit has not explicitly stated that the clear-and-convincing standard applies to judgments that are the result of a settlement, the Tenth Circuit imposed the clear-and-convincing standard on the movant in Zurich N. Am. v. Matrix Serv., Inc., who was attempting to vacate a judgment that was the product of a settlement.  Thus, the Court believes that the clear-and-convincing standard applies in rule 60(b)(3) cases involving judgments that are the result of a settlement.

The more difficult issue is whether the clear-and-convincing standard applies to all aspects of the rule 60(b)(3) motion.  It is arguable that the movant must meet the clear and convincing standard in proving fraud, misrepresentation, or misconduct, but allow the movant to prove that the fraud, misrepresentation, or misconduct impaired the movant's ability to try its case or settle fully

informed.  The Tenth Circuit has not drawn such a distinction, and stated its requirement of clear-and-convincing evidence for rule 60(b)(3) cases in broad terms.  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1290 ("Regardless of the specific form of the allegation, the party relying on Rule 60(b)(3) must, by adequate proof, clearly substantiate the claim of fraud, misconduct or misrepresentation. In other words, 'they must show "clear and convincing proof" of fraud, misrepresentation, or misconduct.'")(internal citations omitted).  The Court believes that the fairest reading of the sweeping language in the Tenth Circuit's rule 60(b)(6) cases suggests that the Tenth Circuit requires the movant to show the impact of the fraud, misrepresentation, or misconduct also by clear and convincing evidence.  In this case, however, even if the Court uses a less rigorous standard, Marcotte has not shown that, absent Sweet's misconduct or if his misconduct had been disclosed, the result would have been different.

The Court must decide whether the conduct and repair that Sweet described, assuming they occurred, substantially interfered with Marcotte's ability to fully and fairly enter into settlement negotiations. Cf. Woodworker's Supply, Inc. v. Principal Mut. Life, 170 F.3d at 993 ("[T]he challenged behavior must have substantially interfered with the aggrieved party's ability to fully and fairly to prepare for and proceed at trial."). Marcotte contends that Sweet and his crew's audit,  and then BNSF's failure to disclose that audit, materially impacted Marcotte's decision to settle this matter.  Marcotte suggests that she was unable to enter into settlement negotiations with a calculated, free, and deliberate choice to settle a case, and properly "weigh[ ] the chance of success against the probable cost of achieving that success through further litigation," because she was not in possession of all the information she was entitled to regarding the crossing.  Schwartz v. United States, 976 F.2d at 218.  Marcotte maintains that the audit by Sweet and his crew made a material difference in the evidence that Marcotte received, and in the way that Marcotte approached

settlement or prepared the case.  See Rozier v. Ford Motor Co., 573 F.2d at 1332.

Because BNSF does not refute that the audit conducted by Sweet and his crew occurred, BNSF's argument is that, even if the work occurred, it would not have altered the aspects of the crossing that Marcotte's expert was examining, and therefore would not have impacted his assessment.  See Tr. at 14:16-25-17:1 (Atkinson).  BNSF also asserts that the condition of the crossing at the time that Marcotte's expert saw it is irrelevant, because the crossing itself would be subject to routine inspection between 2001 and 2004.  See Tr. at 14:1-10 (Atkinson).  BNSF further asserts that the issue of what BNSF had done or not done when the expert went to the site was not relevant during discovery, and was not the topic of discovery.  See Tr. at 14:10-15.

After carefully reviewing the portions of the Farnham deposition that is in the record, and after reviewing the briefs on the Daubert motion, the Court concludes that information about a defect in a mirror in the warning light would not have altered Farnham's expert's conclusions.  See Tr. at 8:25, 9:1-15 (Court & Lyle).  Farnham has not filed an affidavit saying the repair would have made a difference in his conclusions.  He has not stated he did tests to detect the problem Sweet uncovered.  The Sweet repair appears to be a minor adjustment to a mirror to take a shadow out of the light; there is no indication that the flashing light could not be seen.  Also, the record is unclear whether BNSF made other repairs between 2001 and 2004; BNSF continued its federally mandated inspections during the period from 2001 to 2004, which included inspections and repair of lights.  See BNSF Response at 2 (asserting that BNSF has "performed dozens of federally-mandated periodic inspections (all of which required as-needed replacement of gate lights and adjustment of reflectors) all in the intervening years since the collision occurred.").  Finally, Marcotte and her attorney do not file any affidavit indicating that the repair made any difference to the settlement of what appears to be a very weak case.  More specifically, there is no evidence that he activated the

warning lights during his inspection.

To determine whether Farnham and Marcotte would have made a different decision if Sweet had not made changes or if they had known about the alteration, the Court must examine with some care what Farnham thought was the problem at the Alameda crossing and what was not. Farnham noted that "crossing maintenance by the railroad maintenance personnel is a critical factor in maintaining a safe crossing." Id. at 6. One of his conclusions was "[t]he sight distances at the crossings are not satisfactory and proper operation of the active warning devices is essential for a safe crossing." Id. at 8. When questioned about this "sight distance" conclusion at his deposition, Farnham said that he was making an

> [o]bservation in the fact that the site distances were impaired. That is, in the site distance tables that I cited in my report, show what needs to happen. He was going, say, 30 miles an hour, I don't remember at this point what the train speed was, but you'd have to have several hundred feet of no obstructions in the site train. There were trees obstructing his view, which is very obvious, and I didn't specify it, but there's a Federal law that when you have a main line track like this, and you have that site distance obstruction, that you would have to have accurate warning devices. And that's all I was pointing out here that active warning devices are essential, and they are essential to work properly for safe crossing.

Farnham Depo. at 103:16-104:3. Thus, "sight distance" does not directly deal with the warning lights. Rather, it deals with the sight between the driver and the crossing way devices: (i) whether that sight is impaired; and (ii) how far away the driver must be able to see the warning devices.

In its Daubert motion, BNSF challenged, with considerable force, Farnham's conclusions that there were problems with the crossing, because Farnham admitted at his deposition that the issue of sight distances was a non-issue given that "there are active crossing devices at the crossing." Defendants' Daubert Memo. at 21 (citing Farnham Depo. at 103:10-16, 104:4-7). In its Daubert motion, BNSF attacked Farnham for basing his opinions on nothing "other than the witnesses' statements in the police report." Defendants' Daubert Memo. at 18. While there is one statement

in the record which reflects, however, that Farnham relied upon his July 8th inspection of the crossing in coming to his conclusions, it does not indicate that the inspection was the determinative factor in reaching his conclusions.  See Plaintiff's Expert Disclosures and Reports, filed Aug. 23, 2005 (Doc. 53), Confidential Report at 4.  Moreover, at his deposition, Farnham stated that he did not rely on his physical inspection of the crossing in reaching his conclusions.  See Farnham Depo. at 45:15-17, 47:5-48:7, 107:3-18, 139:16-20.   Thus, the bulk of the evidence suggests that Farnham's inspection played little role in his conclusions.  There are other problems with concluding that the absence of, or knowledge of Sweet's audit would have changed Marcotte's settlement calculus.  First, the sight-distances or warning lights are not clearly within Farnham's expertise, and there is no indication that he was sent to check out the alignment of the warning lights or that he activated the lights.  Farnham admitted that the bulk of his testimony in this case would be based upon his "work designing and testing railroad crossing devices," and on "the sum total of [his] many years experience inspecting and testing these crossings, combined with [his] fundamental knowledge of mechanical engineering and physics."  Farnham Aff. ¶¶ 3, 8, at 1-2, 3.  Thus, from the beginning, Farnham was basing his conclusions much more on his experience than on his inspection.

Second, there is no indication that he maintained any of his opinions based on BNSF's maintenance.  Farnham's opinions regarding potential activation failures in the warning systems at the crossing were not based upon BNSF maintenance.  See Farnham Depo. at 141:5-4.  Farnham formed no opinions whether the crossing might have been better maintained, about the modification levels of the boards, about installation of the PMDs, or about the maintenance procedures of the railroad.  See Farnham Depo. at 107:3-18.  He also acknowledged that he had no opinion regarding whether the PMD installed at the crossing was more subject to potential failure than any other PMD. See Farnham Depo. at 107:3-18.

-41-

Third, the bulk of his conclusions regarding the crossing were based upon his experience, not upon his inspection of the crossing.  See Farnham Depo. at 35:4-11, 42:6-23, 47:5-25, 48:1-9 (explaining that his opinion about PMD-1s being subject to potential failures was based upon his experience that he gained while working on a project regarding motion censors/detectors for railroad crossings); Farnham Depo. at 107:3-18 (acknowledging that he had no opinion regarding whether the PMD installed at the crossing was more subject to potential failure than any other PMD); Farnham Depo. at 72:3-74:14 (explaining his opinion regarding gate down time based on the witness statements taken from witnesses at the time of the incident); Farnham Depo at 100:11-101:23 (explaining that his assumption, that the driver would have seen the gates had twenty seconds or more of warning time from the time the lights go on until the train gets there, was based upon his experience at hundreds of crossings because he had never seen an instance where someone did not slow down when the gate was down).  The inspection played a minimal role in his conclusions.  It appears to the Court unlikely that, if Sweet had not made any changes or if Farnham had known about Sweet's audit, Farnham would have reached significantly different conclusions than what he did.

Fourth, the defect that Farnham observed during his physical inspection of the crossing-- a problem with BNSF not having an IRM installed -- was noted both in his report and in his deposition.  See Farnham Report at 7; Farnham Depo. at 48:21-49:25.  That defect does not have any direct relation to the warning lights.  Moreover, this problem does not shed much light on what kind of a crossing inspection he performed.  Other than the areas he photographed, the Court cannot determine much about his inspection.  He did not state whether his inspection was similar to the one performed by Ballinger.  See Farnham Report at 4.

In the end, despite finding some sight problems and the IRM problem, Farnham did not find

that there was any material problem with the crossing, because there were active crossing devices. There is no evidence that whatever changes to the mirrors in the warning light that Sweet corrected would have changed that analysis.   In the end, Marcotte has not offered proof that, if Sweet had not made the light repair, or if Farnham had been aware of the defect repaired by Sweet and his crew, Farnham, as an expert, might have come to different conclusions regarding the condition of the crossing at the time of the incident.

Finally, what is missing in Marcotte's motion and presentation is evidence that shows that Farnham and Marcotte would have made different conclusions if Sweet had not done his audit or if BNSF had disclosed his audit.  Marcotte has not offered proof -- such as affidavits from Farnham or from Marcotte -- that, even with a defect discoverable by Farnham, Marcotte would not have settled for what she did, or would not have settled at all.  Farnham does not submit an affidavit saying that he activated the warning lights, that knowledge of Sweet's visit would have changed his conclusions, or that what Sweet did was important.  All that Marcotte offers is her attorney's assertions, and even he does not put any of these assertions in an affidavit.

In sum, there is no clear-and-convincing evidence that Sweet and BNSF have substantially interfered with Marcotte's ability to make a calculated, free, and deliberate choice to settle this case. See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1290.  And even if the Court uses a less rigorous standard, the Court is not convinced that the lack of alterations or disclosure of the repairs would have made a difference.  Marcotte -- by not submitting any affidavits -- has not shown that what Sweet did was important, that it would have been material to their decisions, or that Farnham activated the warning lights.

Farnham's awareness of the defect need not have necessarily caused Marcotte to refuse to settle the case, see Rozier v. Ford Motor Co., 573 F.2d at 1339; however, Marcotte has conceded

that Farnham's conclusions regarding the crossing was only one factor in their decision to settle the case.  See Tr. at 8:25, 9:1-15 (Court & Lyle).  Marcotte has offered no, or inadequate, proof that Farnham's conclusions regarding the crossing were the decisive factor in their settlement calculus.  Marcotte has also failed to establish that more evidence of a similar defect would have caused Farnham to reach a different conclusion.  Without some affidavit from Farnham or from Marcotte, her motion rests on speculation that appears improbable given Farnham's testimony at his deposition.

### C.   THE COURT CANNOT SAY THAT MARCOTTE HAS PRESENTED A MERITORIOUS CLAIM.

While BNSF asserts that Marcotte's claims would not have been meritorious because of issues involving the decedent's alleged negligence and the remaining damages claims, Marcotte is not required to show that her claims would be meritorious.  See In re Stone, 588 F.2d at 1319. ("In the case of default judgments, courts have established the further requirement that a movant demonstrate the existence of a meritorious defense.").  If, however, Marcotte must present a meritorious claim before the Court can grant the rule 60(b) motion, the Court concludes that Marcotte has not  sufficiently made such a showing.  The impression that the Court has of Marcotte's claim is that it was weak on liability and on damages, and it had little more than nuisance value.

The standard for a meritorious claim is low.  Cf. In re Stone, 588 F.2d at 1319 ("[T]he court examines the allegations contained in the moving papers to determine whether the movant's version of the factual circumstances surrounding the dispute, if true, would constitute a defense to the action.").  Under this standard, "the movant's version of the facts and circumstances supporting his defense will be deemed to be true."  Id. The meritorious claim rule "requires sufficient elaboration

of facts to permit the trial court to judge whether the defense, if movant's version were believed, would be meritorious." Id.

Under that standard, assuming that the audit by Sweet and his crew did occur, but that it did not materially alter defects in the crossing before Marcotte's expert inspected the crossing, then BNSF has engaged in misconduct, but Marcotte still does not have an viable claim.  At some point before the inspection, a mirror in the warning light was defective, but that problem would not have made a difference to Marcotte's expert.  The factfinder would have little basis to conclude it was materially defective at the time of the accident.  There might be evidence that a reasonable factfinder could conclude that BNSF engaged in misconduct, but it would, not on the record before the Court, be able to determine that it would have made a difference.  See id. at 1319 n.2.

Moreover, Marcotte has not shown that she has a viable claim.  The record shows that she has a very weak case.  When the case settled, there was an ongoing dispute whether the gate was all the way down; nevertheless, there is evidence that for inexplicable reasons, the decedent's vehicle went through the crossing's gate.  There is evidence that all the car's occupants were on drugs. All of the car's occupants, including Marcotte's decedent, were killed in the incident.  There is little evidence that the crossing was defective or that there was anything that BNSF could have done to prevent the decedent's actions.  In sum, while the Court does not believe that Marcotte must show a meritorious claim to set aside the judgment, the many problems with her case help show why Marcotte has failed to demonstrate that Sweet's actions and the failure to disclose them would not have had a material impact on her settlement calculus.

### D.  THE COURT DOES NOT BELIEVE THE NON-DISCLOSURE DURING DISCOVERY IS SUFFICIENT TO EVIDENCE INTENT TO DEFRAUD MARCOTTE OR THE COURT.

Marcotte's Interrogatory Number Ten came closest, in scope, to covering the audit by Sweet

and his crew, but was answered before the Sweet audit.  Although the Court's November 9, 2005 Order ordered BNSF to amend its answers to some of Plaintiff's interrogatories, number ten was not among them.  See Order, filed Nov. 9, 2005 (Doc. 89) (stating that, consistent with the Court's ruling at the hearing on the motion and for the reasons given at the time of that hearing, it would partially grant Plaintiff's motion to compel BNSF to amend its discovery answers.).  Thus, Marcotte's case for discovery abuse rests on requests that do not clearly cover the Sweet audit, on failures to amend or support, and the failure to live up the promise that BNSF's counsel made.

BNSF cites to Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1292, for the proposition that its non-disclosure of Sweet and his crew's conduct  in pretrial discovery, even if a discovery abuse, does not, as a matter of law, constitute adequate grounds to obtain relief from the judgment on the basis of rule 60(b)(3).  See Defendants' 60(b) Response at 9.  The audit of the crossing done by Sweet and his crew was shortly before July 8, 2005, and was not clearly within the ambit of the compelled responses covered by the Court's November 9, 2005 order.  Moreover, the representations BNSF made during the hearing on August 10, 2005, were apparently not fulfilled because the case settled.  In sum, BNSF suggests that the discovery picture is too unclear to find a discovery abuse justifying an order vacating the judgment.

In one sense, Marcotte's rule 60(b) motion is distinct from the one in Zurich N. Am. v. Matrix Serv., Inc., and the Court can distinguish the procedural posture in Zurich N. Am. v. Matrix Serv., Inc. from that here.  In Zurich N. Am. v. Matrix Serv., Inc., the information was not directly contested in the judicial proceedings, and the affected party could reasonably assume that the opposing party was aware of the issue.  See 426 F.3d at 1292.  In contrast, Marcotte was unaware of the conduct by Sweet and his crew, could not be expected to know of Sweet's actions, could not contests the information and therefore had no reason to request documentation about it.  See id. at

1292.  And not only did BNSF alter the evidence, it failed to disclose that alteration.  The situation here is more prejudicial, but the degree of prejudice alone does not necessarily imply fraud as opposed to negligence.

On the other hand, the Court does not believe that the non-disclosure of the Sweet audit and repairs alone constitutes fraud on the Court.  The failure to disclose the Sweet audit could be the result of negligence just as easily as fraud.  After the hearing, Ms. Saiz may have failed to advise BNSF about her representation and promise.  Or the person at BNSF to whom she talked about the hearing may not have known about Sweet's actions.  Sweet may not have told anyone at BNSF, making it difficult for BNSF's counsel to know and disclose.

There are a number of plausible explanations -- besides fraud on the court or on Marcotte -- for the non-disclosure in discovery.  The Court cannot fairly and reasonably, on the record, draw an inference of intent to deceive, either the other party or the Court, from the evidence before it.

BNSF's counsel contends that, because Marcotte did not "move to compel further responses to Amended Interrogatory No. 2 or 10 . . . [Marcotte] thus by approximately June 21, 2005, had 'accepted' BNSF's objections as valid and waived any right to challenge the adequacy of BNSF's answers and objections."  Mr. Atkinson's May 2, 2007 Letter at 3.  BNSF answered these interrogatories on June 1, 2005 -- before Sweet's audit.   See Certificate of Service, filed June 1, 2005 (Doc. 41).  While BNSF had a duty to amend the answers as it came upon more information, it is difficult, on the record before the Court, for the Court to say that BNSF did not amend because of fraudulent intent.

To the extent that the Tenth Circuit in Yapp v. Excel Corp. requires fraud on the court before a movant can satisfy rule 60(b)(3), the non-disclosure does not constitute fraud on the court.  "Less egregious misconduct, such as nondisclosure to the court of facts allegedly pertinent to the matter

before it, will not ordinarily rise to the level of fraud on the court." Weese v. Schukman, 98 F.3d 542, 552-53 (10th Cir. 1996) (internal quotation omitted). "It has been held that the allegation of nondisclosure in pretrial discovery will not support an action for fraud on the court." United States v. Buck, 281 F.3d at 1342. In Zurich N. Am. v. Matrix Servs., Inc., the Tenth Circuit stated: "Zurich's allegation of nondisclosure plainly does not meet the requirements of Yapp, because it provided no evidence of 'an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme." Zurich N. Am. v. Matrix Servs., Inc., 426 F.3d at 1292 (quoting Yapp v. Excel Corp., 186 F.3d 1231 (internal quotations omitted).

Even if the Court were to apply a less rigorous standard for fraud between the parties under rule 60(b)(3), Marcotte has not provided evidence that satisfies such a standard. Marcotte fails to establish that the nondisclosure of Sweet's audit and repair constitutes fraud, misrepresentation, or misconduct between the parties. Marcotte's proof consists of no more than that the BNSF did not disclose the audits and repairs, despite promises to do so; not amending responses; not providing adequate responses; and not complying with a discovery order. There may be a number of explanations for the discovery issues besides fraud: (i) BNSF's counsel did not know about Sweet's conduct in a timely manner; (ii) BNSF did not amend the responses because the parties began to focus on settlement; or (iii) the responses were appropriate when made and then not amended. Marcotte's contention that BNSF's failure to disclose the Sweet audit and repair was dishonest, or created an intentional false representation, is conclusory and not supported by more than speculation. "Allegations of discovery abuses of this kind do not arise to the level of fraud between the parties." Zurich N. Am. v. Matrix Servs., Inc., 426 F.3d at 1292.

"It is true that a failure to disclose requested information during discovery may constitute misconduct under Rule 60(b)(3)." Zurich N. Am. v. Matrix Servs., Inc., 426 F.3d at 1292.

"However, this usually requires the violation of a <u>specific </u>discovery request or order."   <u>Id.</u> (emphasis added).  Because Marcotte did not know about the Sweet audit, and could not have brought the issue squarely before the Court, there was no express discovery order in the case covering the production of information about the audit.  Moreover, the Court's November 9, 2005 order is not so precise that the Court can confidently say that a violation of it constitutes fraud.  "In any event, arguable violations of rule 26 do not satisfy the clear and convincing evidence of fraud, misrepresentations or misconduct standard." <u>Zurich N. Am. v. Matrix Servs., Inc.</u>, 426 F.3d at 1292.

Thus, the Court does not believe that the non-disclosure of the audit during pretrial discovery satisfies rule 60(b)(3)'s rigorous requirements.  The Court believes that, on the record before it, BNSF's non-disclosure can be plausibly and reasonably explained as well by negligence as by fraud. In sum, the Court concludes that Marcotte has not shown by clear-and-convincing evidence, or otherwise, that the non-disclosure was a product of fraudulent intent.[7]

## V.  RELIEF IS NOT APPROPRIATE UNDER RULE 60(b)(6).

Without more evidence than is in the record, Marcotte has not shown by clear-and-convincing evidence that BNSF's counsel participated in, or were aware of, the wrongful conduct of BNSF's employees.  The Court cannot therefore ground its decision on a finding that BNSF's counsel participated in any way or were aware of the wrongful conduct of BNSF's employees. While the Court is concerned that BNSF's counsel did not, in its submissions and at the hearing, deny its participation or knowledge, the burden is on Marcotte to make the necessary showing.

---

[7]If rule 60(b)(3) under Tenth Circuit law included all discovery misrepresentations or nondisclosures rather than only fraudulent misrepresentations and misconduct, the discovery problem here might well justify vacating the judgment.  <u>See</u> <u>Rozier v. Ford Motor Co.</u>, 573 F.2d 1332, 1339 (5th Cir. 1978). Tenth Circuit law does not permit, however, a lower standard that does not include intent to deceive.

While there may be situations where a party commits fraud on the court and the attorney is unaware of the fraud, such a scenario is probably the exception rather than the rule.  In many causes, the fraud-on-the-court claim is strengthened by evidence of counsel's participation or acquiescence.  Any such evidence is lacking here.  Specifically, it is uncertain whether BNSF's counsel knew of the audit by Sweet and his crew at the time that it promised to provide maintenance information or before settlement.  Accordingly, Marcotte has not proven by clear-and-convincing evidence that BNSF's counsel participated in any fraud upon the court.

While the Court does not believe that counsel necessarily has to be misled before there is fraud on the court, the lack of evidence that counsel participated in the misconduct hurts the Marcotte's rule 60(b)(6) motion. Rule 60(b)(6), given its more liberal time restraints, is reserved for the most egregious cases.  If Marcotte's case cannot satisfy rule 60(b)(3)'s standards, especially given the Tenth Circuit's injection of some rule 60(b)(6) standards into its rule 60(b)(3) analysis, it is unlikely she can satisfy rule 60(b)(6)'s rigorous requirements.  Here, while BNSF's conduct was fraudulent and done with fraudulent intent, Marcotte cannot get over the hurdle of showing that Sweet's actions made any difference.

## VI.   THE COURT WILL NOT ALLOW MARCOTTE TO ASSERT NEW OR ADDITIONAL CLAIMS FOR INTENTIONAL SPOLIATION OF EVIDENCE, SANCTIONS, AND PUNITIVE DAMAGES.

BNSF addressed Marcotte's request that, if the Court vacates the judgment, she be allowed to assert new or additional claims for intentional spoliation of evidence, sanctions, and punitive damages by arguing that additional relief cannot be granted under rule 60(b).  See Defendants' 60(b) Response at 7; Tr. at 29:15-30:1-5 (citing United States v. $119,980.00, 680 F.2d 106, 107 (11th Cir. 1982). The United States Court of Appeals for the Eleventh Circuit has stated that Relief under 60(b) is available only  to "set aside the prior order or judgment."  United States v. $119,980.00, 680 F.2d

at 107.  "It cannot be used to impose additional affirmative relief."  Id.  Here, the Court has determined that it is not appropriate, on the record before it, to vacate the judgment.  There is thus no pending federal case in which to bring the new claims.  The Court will not grant Marcotte's request to assert new claims.

**IT IS ORDERED** that the Plaintiff's Motion for Relief from Judgment Pursuant to Rule 60(b) for Fraud is granted in part and denied in part.  The Court granted Marcotte's request for a hearing, which was held on May 1, 2007.  The Court denies Marcotte's request that the Court's order dismissing the case with prejudice be vacated, and this matter be reopened.  Marcotte's request to amend the Complaint is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James P. Lyle
Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

     *Attorney for the Plaintiff*

Brenda M. Saiz
Dines & Gross, P.C.
Albuquerque, New Mexico

– and –

Clifford K. Atkinson
Michael E. Kaemper
Atkinson & Thal, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Burlington Northern*
     *Santa Fe Railroad Corporation*