# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

GLORIA MARCOTTE, As the Personal
Representative of the ESTATE OF JOSEPH ORTEGA,

      Plaintiff,

vs.                                                                    No. CIV-04-0836 JB/RLP

BURLINGTON NORTHERN SANTA FE RAIL
CORPORATION, a Texas corporation, NATIONAL
RAILROAD PASSENGER CORPORATION d/b/a
AMTRAK,

      Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Burlington Northern and Santa

Fe Railway Company's ("BNSF") Motion for Rule 11 Sanctions, filed February 22, 2007 (Doc. 108)

("BNSF's  rule 11 Motion"). The Court held a hearing on this motion on May 1, 2007.  See Clerk's

Minutes, filed May 1, 2007 (Doc. 117).  The primary issue is whether the Court should, under rule

11 of the Federal Rules of Civil Procedure,  sanction Marcotte's counsel for filing the Marcotte's

Motion for Relief from Judgment Pursuant to Rule 60(b) for Fraud, see Plaintiff's Motion for Relief

from Judgment Pursuant to Rule 60(b) for Fraud, filed December 22, 2006 (Doc. 101) ("Marcotte's

60(b) motion"), and for refusing to withdraw that motion after receiving that motion and

memorandum brief.  Because the Court believes that Marcotte's counsel acted reasonably under the

circumstances the Court will not sanction Marcotte's counsel for filing her rule 60(b) motion.

## PROCEDURAL BACKGROUND

This action arose from a train-vehicle collision that occurred at the Alameda railroad crossing in Bernalillo County, New Mexico on July 8, 2001.  See Notice of Removal from Second Judicial District Court, filed July 22, 2004 (Doc. 1), Exhibit A, Complaint ¶ 8, at 2 ("Complaint"). "[A]t approximately 6:44 p.m., Joseph Ortega was a passenger in a 1989 4-door Chrysler New Yorker belonging to and driven by Fabian Ortega [. . .]. Also present was Sharon Ortega." Complaint ¶ 8, at 2.  Gloria Marcotte filed her action in state court as the Personal Representative of the Estate of Joseph Ortega.  See Complaint at 1.  The Defendants removed the suit to the federal court on the basis of federal question and diversity jurisdiction.  See  Notice of Removal from Second Judicial District Court  ¶¶  5, 7, at 2, filed July 22, 2004 (Doc. 1).

### 1.    The Parties' Basic Theories.

One of Marcotte's basic theories was that the crossing-warning system at the accident site had not functioned properly and that, as a result, the vehicle in which Marcotte's decedent was traveling did not receive adequate warning that a train was approaching.  See Complaint ¶¶ 11, 13(a), 13(e), 13(f), 16, at 3- 4, 7-8. Marcotte alleges that BNSF was negligent in the maintenance of its track, crossing, and property by failing to "maintain its track, railroad crossing and right of way in a safe and reasonable condition in violation of New Mexico and federal law.  Non-compliant track conditions were ignored and misreported."  Complaint ¶¶ 12, 13(a)-(c), at 3.  Marcotte additionally alleged that BNSF "knew or should have known that the gates, warning lights, and/or warning signals were defective and failed to provide motorists warning of the approach of a train at [the Alameda] crossing."  Complaint ¶ 13(e), at 4.  Marcotte also accused BNSF of entrusting "the maintenance of the railroad crossing to individuals when it knew, or should have known, said individuals were not properly instructed on issues of safety for the motoring public."  Complaint ¶

13(i), at 4.  Lastly, Marcotte alleged that the "[r]equired inspections of track and crossings were not performed, misreported and repeatedly failed to identify obvious non-complaint conditions." Complaint ¶ 13(j), at 5.

Throughout this litigation, BNSF has denied that the crossing suffered from any defect.  See Answer of the Burlington Northern and Santa Fe Railway Company to Plaintiff's Complaint for Negligence, Wrongful Death, and Punitive Damages at ¶¶ 11, 13, 16, at 2-3, filed July 22, 2004 (Doc. 5)("Answer").  BNSF asserted nine defenses in its Answer to Marcotte's Complaint.  See Answer of the BNSF to Plaintiff's Complaint for Negligence, Wrongful Death and Punitive Damages ("Answer") at 6-7, filed July 22, 2004 (Doc. 5).  These defenses included: that Marcotte failed to state claim upon which relief could be granted; that the federal preemption and/or compliance with application federal statutes and regulations barred Marcotte's claims; that  any damages suffered by Marcotte were the result of an independent intervening cause or caused by the negligence of a third party; that Marcotte's injuries and damages were not foreseeable; that the Marcotte's decedent was negligent and therefore any recovery should be reduced by comparative negligence; that Marcotte's decedent was negligent per se; and that the Eighth and Fourteenth Amendment of the United States Constitution and Article II, Section 13 of the New Mexico Constitution barred Marcotte's claims for punitive damages.  See Answer at 6-7.  BNSF argued that Marcotte's decedent was negligent per se in driving through the crossing while the lights were flashing and the crossing arm of the gate was descending.  See Defendants' Motion for Partial Summary Judgment that Joseph Ortega's Driver was Negligent Per Se ¶ 1, at 1-2. ("Defendants' Summary Judgment Motion"), filed Sept. 16, 2005 (Doc. 57).  BNSF also argued Marcotte's decedent was negligent per se for being under the influence of cocaine and alcohol, and driving on a suspended license at the time of the incident.  See Defendants' Summary Judgment Motion ¶¶ 2-3,

at 2.

### 2.    Initial Discovery.

The Court held its initial scheduling conference on April 7, 2005.  At that scheduling conference, the Court set the deadline for discovery as October 4, 2005.  See Order Adopting Attorneys' Provisional Discovery Plans, filed Apr. 4, 2005 (Doc. 30); Amended Attorneys' Provisional Discovery Plan at 3, filed Apr. 6, 2005 (Doc. 27).   The Court also ordered  Marcotte to identify her experts, produce her experts' reports, and have her experts ready to be deposed by August 31, 2005.  See Initial Pretrial Report at 6, filed April 8, 2005 (Doc. 32).

Marcotte served her First Set of Interrogatories and Requests for Production on April  7, 2005.  See Certificate of Service, filed April 7, 2005 (Doc. 28).  On April 29, 2005, Marcotte served her First Amended Interrogatories and Requests for Production on the Defendants.  See Certificate of Service, filed April 29, 2005 (Doc. 39).  On June 1, 2005, the Defendants certified that they had submitted their answers, responses, and objections to the Marcotte's First Amended Interrogatories and First  Requests for Production.  See Certificate of Service, filed June 1, 2005 (Doc. 41).

Interrogatory Number Two asked BNSF to "provide a complete description of the construction history of the warning lights, audible warning devices, gates, crossbucks, right-of-way, road surface and crossing surface at the rail/highway crossing at issue from 1990 to present."  Letter from James P. Lyle to the Court at 3 (dated May 1, 2007), filed May 7, 2007 (Doc. 118).[1]  To that interrogatory,  BNSF answered on May 9, 2005: "See Public Works File, bates numbered and identified as . . . BNSF-0015-BNSF00212, undated, file, Public Project Engineering file for the

---

[1]Marcotte attached portions of BNSF's answers and objections to her First Amended Interrogatories to her Motion to Compel, filed July 12, 2005 (Doc. 45), and Mr. Lyle's May 1, 2007 letter.

Alameda Road Crossing, MP 894.83, DOT 013796.L."  Mr. Lyle's May 1, 2007 Letter at 3.

Marcotte asked BNSF in Interrogatory Number Three to provide full and complete details of all inspections of the crossing that were conducted in the ten years preceding the accident. <u>See</u> Plaintiff's Motion to Compel at 6 (asking BNSF to provide "full and complete details regarding all inspections of the subject crossing which were conducted in the ten (10) years preceding the accident."). In Interrogatory Number Four, Marcotte asked for full and complete details of any reports or complaints received by BNSF regarding the railroad crossing at issue. <u>See</u> Plaintiff's Motion to Compel at 7. In Interrogatory Number Eight, Marcotte requested BNSF to describe any investigation that was conducted by it or on its behalf concerning the accident.  <u>See</u> Plaintiff's Motion to Compel at 10. In addition, Marcotte demanded that BNSF produce any documents or facts concerning maintenance and inspection of the crossing in the ten years preceding the accident. <u>See</u> Plaintiff's Motion to Compel  at 14-15 (appended pages from Defendant BNSF Railway's Responses and Objections to Plaintiff's First Amended Request for Production of Documents and Things, Requests for Production Numbered 2 and 5).  Lastly, Interrogatory Number Ten asked BNSF to provide "full and complete details regarding any inspection, maintenance, service or repair of the warning lights, audible warning devices, gates, crossbucks, right-of-way, road surface and crossing surface at the rail/highway crossing at issue **from 1990 to present**."  Mr. Lyle's May 1, 2007 Letter at 5 (emphasis added). On May 9, 2005, BNSF responded that it

> objects to responding to any discovery request to the extent it inquires for a period prior to July 8, 2000, and such discovery request is overly broad, burdensome, oppressive, vague, and is neither relevant nor likely to lead to the discovery of admissible evidence and is beyond the scope of Federal Rule of Civil Procedure 26. BNSF further objects on the ground that the discovery request imposes burden or expense that outweighs the likely benefits obtained, taking into account the needs of the case, the amount in controversy, the parties [sic] resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.  Without waiving those objections, see Answer and Objections

to Interrogatory No. 3.

Mr. Lyle's May 1, 2007 Letter at 5.

**3.      Larry J. Farnham's Expert Report Regarding the Crossing.**

On July 8, 2005, Marcotte's expert, Larry J. Farnham, inspected the Alameda crossing for the purpose of determining whether he could identify any ascertainable defects in the functioning or operation of the crossing.  See Plaintiff's Motion for Relief from Judgment Pursuant to Rule 60(b) for Fraud ¶ 4, at 2, filed December 22, 2006 (Doc. 100) ("Marcotte's 60(b) Motion").  Although Farnham inspected the crossing and took pictures[2] of the crossing signal case interior, Harmon Phase Motion Detection #1 (PMD-1), track, grade crossing itself and overall pictures of the active warning devices, there is no indication of what exactly Farnham did during his inspection of the crossing. See Farnham Report at 4.  Specifically, Farnham does not indicate -- in his report or at his deposition -- that BNSF activated the warning lights or crossing arms for him during his inspection.  The PMD-1"controls the grade crossing active warning system.  The PMD-1 is a train detection unit that detects the motion of a train as it proceeds towards the crossing, starting the flashing lights and subsequently lowering the gates."  Farnham Report at 4.  "If the train stops or the train is moving away from the crossing the PMD-1 will turn off the Active Warning system allowing road traffic to proceed."  Id.

In the course of this inspection, although the expert did not identify any defects in the functioning of the warning lights, which flash when a train is approaching the crossing, see id., he

_____

[2]The quality of the pictures attached to the copy of Farnham's Report in the record is very poor. They are black-and-white photocopies of the photographs.  See Farnham Report at 13-15. Because the copies of the photographs are of such poor quality, the Court is unable to discern from them whether Farnham took photographs of the warning system while it was activated.  Farnham refers to lights and gates at the crossing as "the Active Warning system" without explaining whether the warning system was activated.  Farnham Report at 4.

described the warning lights at the crossing as follows:

> The crossing warning system consists of an active warning system of flashing lights and gates.  There is a set of mast-mounted flashers on the signal mast for each direction of travel.  There are also Cantilever mounted flashers for the center lanes of travel.  These consist of both forward facing flashers and back facing flashers for traffic in the opposite direction.  In total there are six sets of flashing lights.

Plaintiff's Expert Disclosures and Reports, filed Aug. 23, 2005 (Doc. 53), Confidential Report of Wilfred Lawrence Farnham, Jr. (Larry) at 4 ("Farnham Report").  Initially, in his report Farnham makes the following conclusions: (i) the "site distances at the crossing are not satisfactory and proper operation of the active warning devices is essential for a safe crossing"; (ii) the witness statements prove that the gate malfunctioned at the time of the incident; (iii) the "crossing gate would have been broken off at the sheer pins if hit by the accident vehicle with gate arms in the full down position"; (iv) a "gouge mark on the road confirms that the accident vehicle was in the correct lane of travel when passing the gate arm"; (v) the incident likely would not have occurred if the active warning system at the crossing had provided twenty seconds of warning time; (vi) the incident likely would not have occurred if the warning system at the crossing had provided five seconds of gate down time before train arrival; (vii) the active warning system as installed in the crossing is subject to "potential activation failures."  Memorandum in Support of BNSF Railway and Amtrack's First Motion in Limine, to Exclude Opinions of Larry J. Farnham, and Disqualify Him as Plaintiff's Expert at 9, filed September 15, 2005 (Doc. 56) ("Defendants' Daubert Memo."), Exhibit C, Confidential Report of Larry J. Farnham ("Farnham Report") at 8.

Much of Farnham's report is a general discussion of equipment, what the design can do , and what equipment BNSF did not have.  Farnham noted that the PMD-1 can cause activation failures in the warning system at the crossing.  See Farnham Report at 6.  He also noted "crossing maintenance by the railroad maintenance personnel is a critical factor in maintaining a safe

crossing." Farnham Report at 6. Farnham noted that an Island Recovery Module ("IRM") module can solve the activation problems with the PMD-1, but that BNSF has not installed an IRM at the crossing where the incident occurred. See Farnham Report at 7.

### 4. The Sweet Audit.

Unbeknownst to Marcotte and her expert, BNSF had sent a crew of four employees to the crossing days before the inspection by Marcotte's expert. See Marcotte's 60(b) Motion ¶ 5, at 2. In later explaining the purpose of this visit, Sweet stated that, because there was "[a] pending lawsuit . . . we had a meeting scheduled with the plaintiff's attorney with their expert witness and we just wanted to audit the crossing before them getting out there to make sure there wasn't anything we needed to take care of before their expert witness seen it." Marcotte's 60(b) Motion, Exhibit No. 1, Statement of Russell Sweet at 17:137 ("Sweet Statement"). Marcotte's counsel believes that this statement came in a Federal Employers Liability Act ("FELA") action to address injuries that one of the four BNSF employees who was attempting to repair the defects at the crossing suffered at the time of the July 2001 visit. See Marcotte's 60(b) Motion at 3 n.2.

In the course of the July 2005 inspection, BNSF employees discovered that one of the lights could not be adjusted "to where you could get a good light. It had a shadow in it all the time, which generally indicates the mirror is in wrong or there is something wrong with the mirrors." Sweet Statement at 15:113. Sweet and the other BNSF employees then "went back to the shop to get a new mirror to replace the light." Sweet Statement at 15:113.

Sweet described the work done: "You just walked down the road, at that you kind of go, depending on footage or speed of traffic, you go so many feet out to try and focus the light where you get the best, the bright light at a certain distance from the crossing." Sweet Statement at 15:115. In addition, the BNSF employees were apparently instructed to audit the entire crossing and adjust

anything that was not in working order:

> Question: Okay, that's what I'm trying to establish. So there was [sic] four of your present for the job briefing. And the job briefing also included what the task was going to be of changing the light.
>
> Answer: Well at that time the changing of the light was not thought of yet.
>
> Question: Okay, when Russell Sweet and Dan Owsley were there with you what, what was the task then?
>
> Answer: We were going to look over the crossing.
>
> Question: Okay
>
> Answer: Check and make sure that the lights aligned, the bell was ringing, the voltage, the batteries.
>
> Question: Everything?
>
> Answer: Just everything.

Plaintiff's Reply in Support of Her Motion for Relief From Judgment Pursuant to Rule 60(b) for Fraud at 2 (quoting Sweet Statement at 8).[3]  Neither Marcotte's counsel nor her expert was informed or advised that BNSF employees had altered the lights at the scene before the inspection by Marcotte's expert. See Marcotte's 60(b) Motion ¶ 7, at 3.

### 5. Marcotte's Motion to Compel.

On July 12, 2005, Marcotte filed a Motion to Compel Full Discovery Responses from BNSF. See Plaintiff's Motion to Compel Full Discovery Responses from the Defendant BNSF, filed July 12, 2005 (Doc. 45) ("Plaintiff's Motion to Compel"). In that motion, Marcotte alleged that BNSF had failed to fully answer Interrogatories numbered three, four, six, seven, eight, and fourteen, and failed to respond to request for production numbered two and five.  See Plaintiff's Motion to

---

[3]Marcotte failed to attach page 8 of the Sweet statement as an exhibit, but quoted from that page in the body of her Reply.

Compel at 4, 6-16.

In BNSF's Response to the Plaintiff's Motion to Compel Full Discovery Responses from

BNSF, it stated:

> The [Plaintiff's Motion to Compel Full Discovery Responses from BNSF] is based
> on a characterization that the crossing protection at this crossing 'has a history of
> malfunction,' referring to a single malfunction that occurred in 1995, six years prior
> to the collision in this case.  That characterization, is, as Plaintiff's counsel is aware,
> incorrect because at the request of law enforcement officers at the scene of the
> collision, the protective devices were tested immediately following the collision and
> were found to be operating correctly.  Indeed, BNSF produced the maintenance and
> testing records for these protective devices for the one-year period preceding the
> collision and aside from the routine replacement of lights and bulbs and other parts,
> the protective devices performed flawlessly.

Response to the Plaintiff's Motion to Compel Full Discovery Responses from BNSF at 2, filed July

28, 2005 (Doc. 48)("BNSF Response to Plaintiff's Motion to Compel").  BNSF argued that the

Plaintiff's Motion to Compel was untimely, that there was an agreement between Marcotte's counsel

and BNSF that Marcotte's counsel would not compel further responses from BNSF if BNSF

provided circuitry plans, which BNSF did provide, and that the Plaintiff's Motion to compel sought

"to compel the production of thousands of documents over a decade-long period that have virtually

nothing to do with the case and which would be incredibly burdensome to locate, review, and copy."

BNSF Response to Plaintiff's Motion to Compel at 2.   BNSF also limited its answers to

Interrogatory Number Four to "trouble tickets" for one year preceding the date of the incident.  See

Plaintiff's Motion to Compel at 7, BNSF Answer to Interrogatory Number 4, (explaining that trouble

tickets "document specific incidents in which a member of the public (either private or police entity)

has contacted BNSF and reported a problem with this crossing.").

The Court held a hearing on the Plaintiff's Motion to Compel and BNSF's Response on

August 10, 2005. See Clerk's Minutes, filed Aug. 10, 2005 (Doc. 52).  At the hearing on the motion

to compel, the Court ordered BNSF to amend its answers to interrogatories numbered three, four, six, seven, and fourteen. See Transcript of Hearing at 11:1-5 (Court), 13:7-14 (Court), 14:19-15:6 (Court), 16:5-22 (Court)(taken August 10, 2005)("Discovery Motion Tr.")[4]; Order, filed November 9, 2005 (Doc. 89). Mr. James P. Lyle, on behalf of Marcotte, and Ms. Brenda Saiz, on BNSF's behalf, both agreed discovery was still ongoing until September or October. See Discovery Motion Tr. at 4:3-6 (Court, Saiz & Lyle).  BNSF's counsel also agreed, at that same hearing, to see if there had been any discipline or maintenance involving the crossing from July 8, 2000 until August 10, 2005, and promised it would produce any information to Marcotte.  See Discovery Motion Tr. at 14:19-25, 15:1-6 (Court & Saiz); Discovery Motion Tr. at 4:3-6 (Court, Saiz & Lyle).  The Plaintiff's counsel agreed to limit their Interrogatory Number Four to "trouble tickets."  Discovery Motion Tr. at 11:8-13:18 (Court, Lyle, & Saiz).

## 6.   **Ballinger's Inspection.**

On August 29, 2005, the Defendants' expert, Forrest H. Ballinger, visited the crossing site. See Defendants' Motion for Summary Judgment Dismissing Complaint, or, Alternatively, Partial Summary Judgments, filed November 2, 2005 (Doc. 85), Exhibit C, Affidavit of Forrest H. Ballinger ¶ 5, at 2.  During his visit, Ballinger met with the BNSF Signal Supervisor, Russell Sweet . See id. Ballinger asked Mr. Sweet to deploy the gates, operate the warning lights, and ring the pedestrian bell. See id.; Defendants' Motion for Summary Judgment Dismissing Complaint, or, Alternatively, Partial Summary Judgments, filed November 2, 2005 (Doc. 85), Exhibit C, Ballinger Memo at 1 (dated Sept. 29, 2005).  All the equipment was working correctly at that time. See id.

Based in part upon his inspection, Ballinger believed the gates and lights functioned correctly

---

[4] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

on July 8, 2001. <u>See</u> <u>id.</u> ¶ 8, at 3. Specifically, Ballinger noted that "the lights located on the right hand mast, as well as those mounted on the overhead cantilever, were bright and appeared to be properly aligned down the westbound roadway.  <u>See</u> <u>id.</u> ¶ 6, at 2-3.  There is no indication in the record that the inspection done by Ballinger was the same or similar to the inspection conducted by Farnham.

**7.      Farnham's Deposition.**

On August 30, 2005, Farnham gave a deposition in this matter.  <u>See</u> Memorandum in Support of BNSF Railway and Amtrack's First Motion in Limine, to Exclude Opinions of Larry J. Farnham, and Disqualify Him as Plaintiff's Expert at 9, filed September 15, 2005 (Doc. 56) ("Defendants' <u>Daubert</u> Memo."), Exhibit F, Deposition of Wilfred Farnham, Jr. ("Farnham Depo.") (taken Aug. 30, 2005).  Farnham explained that he is an expert in the equipment that controls railroad grade crossings.  <u>See</u> Farnham Depo at 38:23-39:2.  He has some experience in the electrical engineering aspect or electronic design of gate mechanisms in railroad crossings.  <u>See</u> Farnham Depo. at 41:18-22.  Most of his experience is in the electrical engineering aspect or electronic design of the motion detector equipment at railroad crossings.  <u>See</u> Farnham Depo. at 34:25-41:22.

Given what Farnham based his opinions upon, there is no indication that he activated the warning devices, lights, or crossing arm.  Farnham explained that his opinion about PMD-1s being subject to potential failures was based upon experience that he gained while working on a project regarding motion censors/detectors for railroad crossings.  <u>See</u> Farnham Depo. at 35:4-11, 42:6-23, 47:5-25, 48:1-9.  His opinion regarding the IRM was based upon his inspection of the crossing because he did not see one installed on the day he inspected the crossing.  <u>See</u> Farnham Depo. at 49:3-24.  Farnham reached his conclusion about inadequate gate down time based on the witness statements taken from witnesses at the time of the incident.  <u>See</u> Farnham Depo. at 72:3-74:1-14.

-12-

Farnham's assumption, that the driver would have seen the gates if he had twenty seconds or more of warning time from the time the lights go on until the train gets there, was based upon his experience at hundreds of crossings, because he had never seen an instance where someone did not slow down when the gate was down.  See Farnham Depo at 100:11-101:23.  Farnham also noted that generally, when people see an obstacle in front of them, they slow down.  See Farnham Depo. at 101:24-102:2.  Farnham further noted that he observed impaired site distances at the crossing:

> That is, in the site distance tables that I cited in my report, show what needs to happen. He was going say, 30 miles an hour, I don't remember at this point what the train speed was, but you'd have to have several hundred feet of no obstructions in the site train.  There were trees obstructing his view, which is very obvious, and I didn't have to specify it, but there is a Federal law that when you have a main line track like this, and you have that site distance obstruction, that you have to have accurate warning devices.  And that's all I was point out here that active warning devices are essential, and they are essential to work properly for a safe crossing.

Farnham Depo. at 103:16-104:3.  He acknowledged, however, that the issue of site distance is a non-issue if you have active crossing devices.  See Farnham Depo. at 104:4-7.

Farnham formed no opinions specific to the Alameda crossing on maintenance procedures. For example, he did not opine on whether the crossing might have been better maintained, the modification levels of the boards, installation of the PMDs, or the maintenance procedures of the railroad.  See Farnham Depo. at 107:3-18.  He also acknowledged that he had no opinion whether the PMD installed at the crossing was more subject to potential failure than any other PMD.  See Farnham Depo. at 107:3-18.

### 8.    The Defendants' Daubert Motion to Exclude Larry J. Farnham and to Disqualify Him as Marcotte's Expert.

The Defendants filed a motion to disqualify Marcotte's expert on September 15, 2005. See BNSF Railway and Amtrack's First Motion in Limine to Exclude Opinions of Larry J. Farnham, and Disqualify Him as Plaintiff's Expert, filed Sept. 15, 2005 (Doc. 55).  One of the

Defendants' arguments for disqualification was that Farnham is subject to a permanent injunction which prohibits him from offering testimony based upon experience he gained while working for Harmon Industries, Inc. See Defendants' Daubert Memo at 9. Farnham is permitted, however, to "testify or communicate concerning public records and/or documents and things that initially came into [his] possession directly from attorneys representing parties involved in grade crossing issues . . . that [are] delivered to Farnham solely for the purpose of providing consulting and/or expert witness services with respect to those grade crossing issues." Defendants' Daubert Memo. at 9-10 (internal quotations omitted).

Marcotte provided Farnham with the documents concerning the signalization at the Alameda crossing. See Defendants' Daubert Memo. at 15 n. 3. Farnham's area of expertise is in "electrical engineering aspect or electrical design" of the equipment controlling railroad crossings. Defendants' Daubert Memo. at 8 (citing Deposition of Larry Farnham at 30:23-25, 39:1-2, 41:22-21)(Aug. 30, 2005)("Farnham Depo."). Farnham's opinions regarding potential activation failures in the warning systems at the crossing were not based upon BNSF maintenance. See Defendants' Daubert Memo. at 12 n.2 (citing Farnham Depo. at 141:5-14). Farnham also did no studies or tests to determine whether the circuitry installed at the Alameda crossing was subject to a potential failure more than other crossings using similar circuitry. See Defendants' Daubert Memo. at 13. In addition, Farnham concluded that less than twenty-seconds warning time elapsed from the time the warning lights at the crossing began flashing until the train enters the crossing based upon the "impression [he] got from reading all the witness statements." Defendants' Daubert Memo. at 17-18 (citing Farnham Depo. at 144:9-12).

Some of the Defendants' arguments to disqualify or limit Farnham's opinions centered on the basis of his opinions. The Defendants challenged Farnham for basing his opinions on nothing

"other than the witnesses' statements in the police report." Defendants' <u>Daubert</u> Memo. at 18. Farnham also relied, however, upon his July 8th inspection of the crossing in coming to his conclusions. <u>See</u> Plaintiff's Expert Disclosures and Reports, filed Aug. 23, 2005 (Doc. 53), Confidential Report at 4. Farnham also noted that "crossing maintenance by the railroad maintenance personnel is a critical factor in maintaining a safe crossing." <u>Id.</u> at 6.

One of Farnham's conclusions was "[t]he sight distances at the crossings are not satisfactory and proper operation of the active warning devices is essential for a safe crossing." <u>Id.</u> at 8. The Defendants challenged that conclusion, because Farnham admitted at his deposition that the issue of sight distances was a non-issue given that "there are active crossing devices at the crossing." Defendants' <u>Daubert</u> Memo. at 21 (citing Farnham Depo. at 103:10-16, 104:4-7).

### 9.     <u>The Defendants' Motion for Partial Summary Judgment.</u>

On September 16, 2005, the Defendants moved for partial summary judgment. <u>See</u> Defendants' Summary Judgment Motion, filed September 16, 2005 (Doc.57). The Defendants argued that partial summary judgment was appropriate because the decedent's driver, Fabian Ortega was negligent per se in driving through the crossing while the lights were flashing and the crossing arm of the gate was descending. <u>See</u> Defendants' Summary Judgment Motion ¶ 1, at 1-2. They also argued Ortega was negligent per se for being under the influence of cocaine and alcohol, and driving on a suspended license at the time of the incident. <u>See</u> Defendants' Summary Judgment Motion ¶¶ 2-3, at 2.

In support of their motion, they referenced an affidavit of Bruce Dickinson, an alleged witness to the incident, and toxicology reports on the driver and his passengers, including the decedent. <u>See</u> Defendants' Memorandum Brief in Support of Motion for Partial Summary Judgment that Joseph Ortega's Driver was Negligent Per Se at 2-17, filed Sept. 16, 2005 (Doc. 58). Marcotte

responded that it was unknown, as of the time they filed their response, whether Dickinson's version of events was supported by the other witnesses to the incident. See Plaintiff's Response in Opposition to Defendants' Motion for Partial Summary Judgment at 1, filed Oct. 18, 2005 (Doc. 71). Marcotte's attorney subsequently filed an affidavit stating that they could not "adequately respond" to the Defendants' Partial Summary Judgment Motion "relating to the claims of negligence per se with regard to obedience to a signal indicating the approach of a train" because the deposition of one of the alleged witnesses to the event was scheduled for October 24, 2005. Rule 56(f) Affidavit of Counsel for Plaintiff in Response to Defendants' Motion for Partial Summary Judgment at ¶¶ 4, 6, at 2, filed Oct. 18, 2005 (Doc. 72).

Farnham subsequently admitted in an affidavit executed on October 14, 2005, that the bulk of his testimony would be based upon his "work designing and testing railroad crossing devices," and "the sum total of [his] many years experience inspecting and testing these crossings, combined with [his] fundamental knowledge of mechanical engineering and physics." Plaintiff's Response in Opposition to Defendants' Motion in Limine to Exclude and Disqualify Plaintiff's Expert, filed Oct. 17, 2005 (Doc. 69), Exhibit 5, Affidavit of Wilfred L. Farnham ¶¶ 3, 8, at 1-2, 3 (executed on Oct. 14, 2005) ("Farnham Aff.").

BNSF represents, however, that it did not want to settle, and only did so upon the mediator's urging. See BNSF's Response to Plaintiff's Motion for Relief from Judgment Pursuant to Rule 69(b) for Fraud and BNSF's Request for Attorneys' Fees and Costs Pursuant to 28 U.S.C. § 1927 at 5, filed Jan. 25, 2004 (Doc. 104) ("BNSF's Response"). On November 8, 2005, the parties entered into a settlement. See BNSF's Response at 5. On November 16, 2005, the Honorable Judge Richard L. Puglisi, United States Magistrate Judge, entered an order vacating a scheduled settlement conference indicating the parties had reached an amicable settlement. See Order, filed November

-16-

16, 2005 (Doc. 90).  On November 19, 2005 -- unaware that the parties had settled -- the Court entered its order compelling BNSF to amend its answers to various interrogatories, including Interrogatories Numbered 3, 4, 6, 7, and 14.  See Order, filed Nov. 19, 2005 (Doc. 89). That Order was consistent with the Court's rulings at the hearing of August 10, 2005.  See id. There is no indication in the record that BNSF amended its interrogatories.

On January 4, 2006, the parties submitted a motion to dismiss.  See Stipulation Motion to Dismiss, filed January 4, 2006 (Doc. 99).  On January 6, 2006, the Court entered the Order of Dismissal that the parties had submitted.  See Order of Dismissal With Prejudice, filed January 6, 2006 (Doc. 100).

### 10.    Rule 60(b) Motion.

In that motion, filed on December 22, 2006, Marcotte requested that the Court, pursuant to rule 60(b) of the Federal Rules of Civil Procedure, vacate the Order of Dismissal entered on January 6, 2006, and reopen the case against BNSF.  Marcotte argued that the Court should set aside the judgment because of BNSF's fraud, misrepresentation, and other misconduct related to the Sweet audit.  Additionally, Marcotte contended that the Court should set aside the judgment because of other reasons justifying relief, including the possibility that BNSF's counsel engaged in, directed, or was aware of the fraud, misrepresentation, and other misconduct:

> Additionally, it is difficult to imagine that such activities could have been conducted without the knowledge and/or input of counsel for the Defendant. Accordingly, in addition to reopening this judgment on the grounds set forth in Rule 60(b)(3) and (6), Plaintiff requests that this Court also inquire and determine whether counsel for Defendant BNSF are also implicated in the procurement of this fraud. "[T]he fabrication of evidence by a party in which an attorney is implicated will constitute a fraud on the court." United States v. Buck, 281 F. 3d 1336, 1342 (10th Cir. 2002).

Marcotte's 60(b) motion ¶ 9, at 3.

Marcotte asked that, in addition to reopening the judgment on the grounds set forth in rules

60(b)(3) and (6), the Court also inquire and determine whether BNSF's counsel are also implicated in the procurement of the fraud.  Marcotte also asked the Court to determine whether she should be entitled to assert new or additional claims for intentional spoliation of evidence, sanctions, and punitive damages.

In BNSF's response to Marcotte's 60(b) motion, it admitted that the work done by Sweet and other BNSF employees "may have repaired a mirror or a light on one of the crossing gate arms as part of the inspection."  BNSF's Response at 2.  BNSF argued that the "Plaintiffs and their counsel rationally could not have believed that on July 8, 2005, the date the Movant's expert went to the crossing, that it was in the same condition as it was four years earlier on July 8, 2001 (the accident date), and that the gates, lights, and mirrors had not been damaged and replaced." BNSF's Response at 8.  BNSF also asserted that BNSF has "performed dozens of federally-mandated periodic inspections (all of which required as-needed replacement of gate lights and adjustment of reflectors) all in the intervening years since the collision occurred."  BSNF Response at 2.  BNSF further asserted that, even if the conduct described by Sweet was a discovery abuse or non-disclosure, it would not be adequate grounds for relief under 60(b).  See BNSF Response at 9.

BNSF also contended that Marcotte's remaining damages claims for hedonic and loss of earning capacity damages for the decedent Joseph Ortega were not "meritorious." BNSF Response at 12 n. 4. Specifically,  BNSF argued that Marcotte's decedent, Joseph Ortega,  and his fellow car occupants were under the influence of morphine, cocaine, codeine, and alcohol at the time of the incident.  See BNSF Response at 2 (stating that it is "undisputed that passenger Plaintiff Joseph Ortega, along with his fellow occupants (all of whom died in the collision), had ingested varying combinations of morphine, cocaine, codeine, and alcohol prior to the collision."). BNSF characterizes the decedent as "a twice-convicted felon and an adjudicated repeat offender."  Id.

BNSF argued that Joseph Ortega was never employed, never earned a wage, and was ill at the time of his death.  BNSF stated "[t]he eyewitnesses agreed that the Ortega vehicle swerved around the crossing gate, directly into the path of the oncoming train."  BNSF Response at 3.  BNSF argued that, "[g]iven the frivolous nature of the case, BNSF and Amtrak were reluctant to settle.  The settlement, at a nuisance value of $30,000, only occurred because of the urging of mediator Kim Udall."  Id.[5]

The Court held a hearing on that matter on May 1, 2007.  See Clerk's Minutes, filed May 1, 2007 (Doc. 117).  Neither Marcotte nor BNSF presented any new evidence regarding Marcotte's motion.  See Transcript of Hearing (taken May 1, 2007)("Tr."); Clerk's Minutes, filed May 1, 2007 (Doc. 117).  Thus, Marcotte did not identify when she discovered Sweet's statement or argue that it constituted newly discovered evidence under rule 60(b)(2); Marcotte grounded her motion on rule 60(b)(3) and 60(b)(6).  See Tr. at 30:13-25, 31:1-2 (Lyle); Marcotte's 60(b) Motion at 1, ¶ 10, at 3.

Marcotte also did not explain how she had obtained Sweet's statement.  See Tr. at 3:23-25 (Lyle).  Marcotte did not know if the statement was taken under oath.  See Tr. at 7:19-20.  Marcotte's counsel conceded that, if the alleged audit by BNSF employees was routine maintenance, then 60(b) relief would not be appropriate, because a party in litigation does not always know everything when it makes the calculus to settle.  See Tr. at 9:22-25, 8:1-10 (Court & Lyle).

---

[5]BNSF also asserts that the Court has ancillary jurisdiction over the settlement to enforce it and that the Court should enforce the settlement between the parties.  See BNSF Response at 13.  The Court has, however, no ancillary jurisdiction over the settlement agreement of the parties, because the Court did not explicitly retain such jurisdiction in its order dismissing this case with prejudice pursuant to joint motion. See Order, filed January 6, 2006 (Doc. 100); McKay v. United States, 207 Fed.Appx. 892, 895, 2006 WL 3291757(10th Cir. 2006) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 380-81 (1994) (stating "[o]nce a lawsuit is settled and dismissed, the district court does not generally have "ancillary jurisdiction to enforce the parties' settlement agreement. A district court can, however, retain jurisdiction over a settlement agreement if the order of dismissal shows an intent to retain jurisdiction or incorporates the settlement agreement.").

Marcotte's counsel also said that the primary reasons Marcotte decided to settle were that the witnesses to the incident "backed away from what they had told the police" and that, in the expert's opinion, the only problem related to the crossing involved the amount of time it took the gates to descend.  See Tr. at 8:25, 9:1-15 (Court & Lyle).

On the other hand, BNSF did not dispute the veracity or accuracy of Sweet's statement in the FELA proceeding.  Moreover, BNSF did not state that its counsel or its experts were unaware of Sweet's visit.  BNSF referred to its early Daubert motion to exclude Marcotte's expert.  See Tr. at 14:13-25, 15:1-25, 16:1 (Atkinson). Neither side asked for additional time to conduct discovery or to present further evidence on Marcotte's 60(b) Motion.

At the hearing on Marcotte's 60(b) motion, BNSF's counsel argued that none of the Marcotte's outstanding discovery requests would have covered the information contained in Sweet's statement.  See Tr. at 13:7-25; 14:1-15 (Court & Atkinson).  BNSF's counsel represented that there was no discovery request advanced by Marcotte's counsel about later maintenance to the crossing site. See Tr. at 13:21-25, 14:1 (Court & Atkinson).  Marcotte's counsel could not recall, however, if there was outstanding discovery at the time of the expert's visit to the crossing at the time of the hearing, but noted that Marcotte relied upon the Defendants' representations in discovery about maintenance of the crossing.  See Tr. at 8:17-24 (Lyle).

BNSF's counsel also reiterated that, in any case,  allegations of discovery abuse such as those here do not rise to the level of fraud between the parties.  See Tr. 23:1-3 (Atkinson).  After the hearing, Marcotte's counsel sent, by facsimile transmission, a letter to the Court that outlined the discovery requests sent to BNSF regarding the equipment at the crossing.  See Letter from James P. Lyle to the Court (dated May 1, 2007), filed May 7, 2007 (Doc. 118). The requests that Mr. Lyle included in his letter to the Court were interrogatories numbered two, three, and ten.  See Mr. Lyle's

May 1, 2007 Letter at 1.

BNSF's counsel responded to Marcotte's counsel's letter to the Court with its own letter to the Court.  <u>See</u> Letter from Clifford K. Atkinson to the Court (dated May 2, 2007), filed May 7, 2007 (Doc. 119).  In that letter, BNSF's counsel objected to Marcotte "trying to advance this position at this junction."  <u>Id.</u> at 2. BNSF's counsel also relied upon the Court's order regarding Marcotte's earlier motion to compel, which stated in a footnote that: "Counsel represented to the Court that all other [discovery] issues had been resolved."  <u>Id.</u> at 4 (citing to Order, filed Nov. 9, 2005 (Doc. 89)).  <u>See</u> Order, filed Nov. 9, 2005 (Doc. 89) (stating that consistent with the Court's ruling at the hearing on the motion and for the reasons given at the time of that hearing, it would partially grant Marcotte's motion to compel BNSF to amend its discovery answers).

### 11.   <u>Rule 11 Motion.</u>

On February 22, 2007, BNSF filed its Motion for Rule 11 Sanctions.  <u>See</u> BNSF's Motion for Rule 11 Sanctions ("BNSF's rule 11 motion"), filed Feb. 22, 2007 (Doc. 108).  In its motion, BNSF asks that the Court to enter an order sanctioning Marcotte's counsel for filing her rule 60(b) motion and refusing to withdraw it after receiving BNSF's rule 11 motion and memorandum in support of it. <u>See</u> BNSF's rule 11 motion at 1.  BNSF argues Marcotte's 60(b) motion stated "that BNSF's counsel is 'also implicated in the procurement of this fraud.'" BNSF rule 11 motion at 1 (quoting Marcotte's 60(b) motion ¶ 9, at 3).

BNSF argues that the claims asserted in Marcotte's rule 60(b) motion are "neither warranted by existing law nor by a non-frivolous argument for the extension of existing law or establishment of new law."  BNSF rule 11 motion ¶ 3, at 2.  It also accuses Marcotte's counsel of presenting the motion "for an improper purpose, to harass BNSF and its counsel, and to cause a needless increase in the cost of litigation."  BNSF rule 11 motion ¶ 5, at 2.  BNSF gave Marcotte's counsel an

opportunity to withdraw her rule 60(b) motion.  <u>See</u> BNSF rule 11 motion ¶ 6-7, at 2.  Counsel

agreed that BNSF complied with the safe harbor provisions of rule 11 in this matter.  <u>See</u> Tr. at

39:19- 40:1 (Court & Lyle).  Marcotte's counsel did not withdraw her motion.  <u>See</u> Burlington

Northern Santa Fe Railroad Corporation's Memorandum Brief in Support of its Motion for Rule 11

Sanctions, filed Feb. 26, 2007 (Doc. 111) (citing Fed. R. Civ. P. rule 11(c)(1)(A)).

Marcotte's counsel responded to BNSF's rule 11 motion on March 8, 2007.  <u>See</u> Plaintiff's

Response to Defendants' Motion for Rule 11 Sanctions ("Marcotte's response"), filed Mar. 8, 2007

(Doc. 113).  Marcotte responds that the "testimony by BNSF employees, provided in support of the

Motion to Reopen this matter, raises many disturbing questions which counsel for Plaintiff

respectfully asserts must be answered."  Marcotte's response at 1.  Marcotte "agrees that she and

her counsel have an affirmative duty to investigate this matter further.  However, given that the

individuals who have this information are all employees of the Defendant, or their attorneys, this

matter cannot be explored further unless it is reopened and Plaintiff is permitted to issue subpoenas

and hold depositions."  Marcotte's response at 2.  Marcotte also argues that "Litigation is suppose[d]

to result in a search for truth.  It appears that, from [the Sweet statement], Defendant BNSF and its

employees and agents may have undertaken actions designed to thwart that search in sheer defiance

of the power and authority of this Court."  Marcotte's response at 3.

BNSF reiterates its rule 11 motion's arguments in its reply to Marcotte on March 26, 2007.

<u>See</u> BNSF's Reply to Plaintiff's Response to Motion for Rule 11 Sanctions [Doc. No. 109] (BNSF's

Reply), filed Mar. 26, 2007 (Doc. 115).  It also argues that Marcotte's "Response to BNSF's Motion

confirms that Plaintiff's Rule 60(b) Motion was groundless, without a basis in fact or law, that the

Rule 60(B) Motion should be denied, that when counsel filed the Rule 60(b) Motion he had

'absolutely no chance of success under existing precedent' of prevailing, and that Rule 11 sanctions

should be entered."  BNSF's Reply at 1 (citing <u>Cleveland Demolition Co., Inc. v. Azcon Scrap</u>

<u>Corp.</u>, 827 F.2d 984, 988 (4th Cir. 1987); <u>Eastway Constr. Corp. v. City of New York</u>, 762 F.2d 243,

254 (2d Cir. 1985)).

     The Court held a hearing on this  matter on May 1, 2007.  <u>See</u> Clerk's Minutes, filed May

1, 2007 (Doc. 117).  Neither Marcotte nor BNSF presented any new evidence regarding Marcotte's

motion.  <u>See</u> Transcript of Hearing (taken May 1, 2007)("Tr.") ; Clerk's Minutes, filed May 1, 2007

(Doc. 117).  Marcotte did not identify when she discovered Sweet's statement or argue that it

constituted newly discovered evidence under rule 60(b)(2); Marcotte grounded her motion on rule

60(b)(3) and 60(b)(6).  <u>See</u> Tr. at 30:13-25, 31:1-2 (Lyle); Marcotte's 60(b) Motion at 1, ¶ 10, at 3.

BNSF's counsel did not clarify their involvement or knowledge of the Sweet audit.  Counsel agreed

that BNSF complied with the safe harbor provisions of rule 11 in this matter.  <u>See</u> Tr. at 39:19- 40:1

(Court & Lyle).

## <u>LAW REGARDING RULE 11</u>

     When a party signs a paper or pleading submitted to the court, he or she makes specific

representations to the court.  The attorney or unrepresented party certifies that:

> [T]o the  best of the person's knowledge, information, and belief, formed after
> an inquiry reasonable under the circumstances, –
>
> (1) it is not being presented for any improper purpose, such as to harass or to
> cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by
> existing law or by a nonfrivolous argument for the extension, modification,
> or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or,
> if specifically so identified, are likely to have evidentiary support after a
> reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if

specifically so identified, are reasonably based on a lack of information or belief.

Duncan v. Citibank, No. 06-0246, 2007 WL 1302648, at *3 (D.N.M. Mar. 31, 2007)(Browning, J.) (quoting Fed. R. Civ. P. 11(b)(1)-(4)).  Rule 11 requires the signer of a legal document to satisfy his affirmative duty to conduct a reasonable inquiry into the facts and law before filing it,  and mandates the act of filing be reasonable under the circumstances. See Business Guides v. Chromatic Comm., 498 U.S. 533, 552 (1991).  It demands conduct that is objectively reasonable.  See id. at 539.  "The essence of Rule 11 is that signing is no longer a meaningless act; it denotes merit.  A signature sends a message to the district court that this document is to be taken seriously." Id. at 546.  "The standard by which courts evaluate the conduct of litigation is objective reasonableness – whether a reasonable attorney admitted to practice before the district court would file such a document." Adamson v. Bowen, 855 F.2d 668, 673 (10th Cir. 1988).

A district court ruling on a rule 11 motion "must determine whether a reasonable and competent attorney would believe in the merit of an argument."  Dodd Ins. Servs. v. Royal Ins. Co. of Am., 935 F.2d 1152, 1155 (10th Cir. 1991) (citing White v. Gen. Motors, 908 F.2d at 680, and Adamson v. Bowen, 855 F.2d at 673).  Normally a district court's inquiry into whether an attorney has violated rule 11 involves "subsidiary findings, such as the current state of the law or the parties' and attorneys' behavior and motives within the context of the entire litigation, as well as a conclusion on the ultimate issue of whether the pleading violated Rule 11."  Adamson v. Bowen, 855 F.2d at 672.  The focus of rule 11 "relates to the time of signing of a document and imposes an affirmative duty on each attorney and each party, represented or pro se, to conduct a reasonable inquiry into the validity and accuracy of a document before it is signed." Eisenberg v. Univ. of N.M., 936 F.2d 1131, 1134 (10th Cir. 1991).

## ANALYSIS

Because the Court believes that Marcotte's counsel acted reasonably under the circumstances in filing the 60(b) motion, it will deny BNSF's motion for sanctions under rule 11.

Marcotte's counsel acted as a reasonable attorney would under these circumstances in filing the 60(b) motion.  Marcotte's counsel was able to obtain evidentiary support for the allegations contained within the 60(b) motion in the form of Sweet's statement.  Sweet's statement presents a colorable claim of misconduct under 60(b)(3).  See White v. Gen. Motors Corp., Inc., 908 F.2d 675, 680 (10th Cir. 1990) ("It is not sufficient for an offending attorney to allege that a competent attorney could have made a colorable claim based on the facts and law at issue; the offending attorney must actually present a colorable claim.").

The party relying upon rule 60(b)(3) must "show clear and convincing proof of fraud, misrepresentation, or misconduct." Zurich N. Am. v. Matrix Service, Inc., 426 F.3d 1281, 1290 (10th Cir. 2005) (internal quotations omitted).  A movant must show an intent to deceive or defraud the court, by means of a deliberately planned and carefully executed scheme.  See Zurich N. Am. v. Matrix Serv., Inc., 426 F.3d at 1291.  Intent to defraud is an absolute prerequisite.  See id.

Federal Rule of Civil Procedure 26(b) grants parties the ability to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed. R. Civ. P. 26(b).  In some instances, misrepresentations made during the course of settlement regarding discovery can be a valid basis for relief under rule 60(b) if they were relied upon by the movant in deciding to settle.  See Conerly v. Flower, 420 F.2d 941, 943 (8th Cir. 1969) (holding that it was proper to grant relief under 60(b)(3) when the plaintiff and her counsel relied

upon the defendants' misrepresentations regarding amount of coverage available in deciding to settle the case when the plaintiff discovered the misrepresentation approximately seven months after the case had been resolved); Bandai Am., Inc. v. Bally Midway Mfg. Co., 775 F.2d 70, 72-74 (3d Cir. 1985) (holding that a party who surrendered further discovery rights in a settlement agreement was not entitled to reopen judgment where that relinquishment was not causally related to any alleged misrepresentations by opposing counsel). Before a court may order relief under rule 60(b)(3) as a result of misconduct, "the challenged behavior must have substantially interfered with the aggrieved party's ability to fully and fairly to prepare for and proceed at trial." Woodworker's Supply, Inc. v. Principal Mut. Life, 170 F.3d 985, 993 (10th Cir. 1999).

Marcotte's counsel did not violate rule 11 in filing her motion for relief from judgment under rule 60(b). The Court has found clear-and-convincing evidence that BNSF intentionally engaged in misconduct through the audit by Sweet and his crew of the crossing in anticipation of Marcotte's expert inspecting the crossing. Under the circumstances of this case, however, the Court has also concluded that Marcotte did not meet the United States Courts of Appeal for the Tenth Circuit's high standards for showing fraud, misrepresentation, and/or misconduct under rule 60(b)(3), because the actions by Sweet and his crew did not significantly alter the settlement calculus. The Court is convinced that a reasonable attorney faced with the circumstances confronted by Marcotte's attorney could have filed a motion for relief from judgment under rule 60(b). See Adamson v. Bowen, 855 F.2d at 673.

Marcotte's 60(b) motion is not based upon a routine evidentiary conflict. BNSF relies upon Cleveland Demolition Co., Inc. v. Azcon Scrap Corp., 827 F.2d 984 (4th Cir. 1987), to support its argument for sanctions. See BNSF's Memorandum Brief in Support of its Motion for Rule 11 Violation at 3-4; Tr. at 35:15-39:10 (Atkinson). Cleveland Demolition Co., Inc. v. Azcon Scrap

-26-

Corp., is distinguishable, because it involved a party's independent action for relief from judgment based upon evidentiary conflicts between a witness' trial and deposition testimony.  See id. at 986-87.  The United States Court of Appeals for the Fourth Circuit noted that the movant "could certainly have used this evidence to impeach  [the witness] during the initial trial" and as such "cannot use this routine evidentiary conflict to support an action for fraud on the court." Cleveland Demolition Co., Inc. v. Azcon Scrap Corp., 827 F.2d 984, 986 (4th Cir. 1987).

Unlike the movant in Cleveland Demolition Co., Inc. v. Azcon Scrap Corp., Marcotte did not have the ability to address these issues at trial, nor was she aware of the alleged actions by the BNSF's employees until after judgment had been entered.  In Cleveland Demolition Co., Inc. v. Azcon Scrap Corp., the Fourth Circuit decided that, "[r]ather than unravel the finality of judgments through the abuse of Rule 60(b), we adhere to the well-established rule that evidentiary conflicts must be resolved during the initial trial." Id. at 987. Unlike the attorneys involved in Cleveland Demolition Co., Inc. v. Azcon Scrap Corp., Marcotte's counsel did not conduct "only a minimal factual inquiry and a cursory legal investigation."  Id. at 988.  Unlike a credibility contest at trial, a potential discovery violation could substantially interfere with a party's ability to litigate her case. Cf. Anderson v. Cryovac, Inc., 862 F.2d 910, 925 (1st Cir. 1988) (noting that, if discovery material is deliberately suppressed, it might be presumed "to have inhibited the unearthing of further admissible evidence adverse to the withholder, that is, to have substantially interfered with the aggrieved party's trial preparation).

Finally, while Marcotte has suggested that BNSF's counsel may have been involved or had knowledge of Sweet's audit, BNSF's counsel does not deny all involvement or knowledge.  BNSF's counsel did not file an affidavit or present testimony denying any role. Without more, the Court cannot say that Marcotte's concerns were unfounded.

**IT IS ORDERED** that BNSF's Motion for Rule 11 Sanctions is hereby denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James P. Lyle
   Law Offices of James P. Lyle, P.C.
Albuquerque, New Mexico

*Attorney for the Plaintiff*

Brenda M. Saiz
   Dines & Gross, P.C.
Albuquerque, New Mexico

– and –

Clifford K. Atkinson
Michael E. Kaemper
   Atkinson & Thal, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Burlington Northern
Santa Fe Railroad Corporation*

-28-